1996 SD 131

**Eugene KENT, Appellant,**

v.

**Darla L. LYON, Director of Division of Insurance, Appellee.**

No. 19459.

Supreme Court of South Dakota.

Argued Sept. 11, 1996.

Decided Nov. 6, 1996.

Thomas J. Welk, Tamara A. Wilka of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, for appellant.

Mark Barnett, Attorney General, Timothy E. Reilly and Elisabeth O'Toole, Assistant Attorneys General, Pierre, for appellee.

SABERS, Justice.

[¶ 1] Kent appeals the South Dakota Division of Insurance's revocation of his resident insurance agent's license. The Division found Kent violated seven provisions of the Insurance Code. Kent disputes the violations and claims that the revocation of his license is too harsh a penalty. The circuit court agreed with the Division. We affirm.

## FACTS

[¶ 2] Eugene Kent was a licensed insurance agent in South Dakota for twenty-two years prior to the revocation of his license in

January of 1996. He owned and controlled Kent Insurance, Inc. (Kent Insurance), which has been licensed to transact insurance business in South Dakota since 1979.[1] He continues to own and control Kent Financial Services, Inc. (Kent Financial), a business corporation which has never been licensed to transact insurance business in South Dakota.

[¶ 3] Kent became affiliated with the Independent Community Bankers (ICB) in the mid–1980's. ICB is an incorporated association of banks, formed in part to obtain favorable group rates for services, such as insurance, for its members' employees. A member of ICB's board of directors contacted Kent in 1985 about securing health insurance for ICB. He agreed to obtain group insurance for ICB, and ICB ultimately selected him as its exclusive insurance agent and adviser for policy years 1986 through 1991.

[¶ 4] For the policy years 1986 through 1989, he procured a fully-insured group health plan for the employees of member banks of ICB through Central Life Insurance Company (Central). In August of 1989, he received notice from Central that the policy would be cancelled effective November 1, 1989. Apparently the cancellation stemmed from Central's business decision to exit the group health insurance business. He convinced Central to extend coverage through the end of 1989, but he immediately began the search for a new carrier. ICB instructed Kent to obtain a fully-insured health plan similar to the one provided by Central.

[¶ 5] A replacement was found in United of Omaha Insurance Company (United), and after a few months of negotiation, United informed Kent it would provide coverage for ICB, so long as he would handle the administrative work. He agreed, and United issued a group policy effective January 1, 1990. ICB was the policy holder, or owner, of the master policy. The policy was a fully-insured group health plan with United respon-

sible for insurance claims, less deductibles and copayments, up to the policy limits.

[¶ 6] When Central insured ICB, it paid ICB a fee of 1% of the premiums. The fee was designated a "marketing fee" and was intended to reimburse ICB for its promotional efforts to increase enrollment in the insurance program, although it bore no relationship to expenses actually incurred by ICB. During the 1990 policy year, Kent paid ICB the 1% fee from the 8% administration fee which he received from United.

[¶ 7] In late 1990, Kent and United began negotiations for the 1991 policy year. The character of the policy was changed from a fully-insured plan to a self-insured plan. Under the new policy, effective January 1, 1991, coverage was to be self-funded with United liable only for losses in excess of specified limits as set forth in a "stop-loss" insurance policy. United also agreed to provide services to the plan under an "administrative services only" (ASO) agreement, for which it would be paid a fee in addition to the premium it would receive for the stop-loss coverage. Despite a provision in the 1990 plan for a 30–day notice of cancellation, neither United nor Kent informed ICB the fully-insured plan was cancelled.

[¶ 8] Kent approached the ICB board of directors in December of 1990 to inform them of new premium rates. He also told the committee that, as a money saving measure, Kent Financial would act as a clearinghouse for the payment of claims in 1991. This change would mean benefit checks would bear Kent Financial's and United's names. He did not tell the committee the plan had been converted to a self-insured policy. He also informed the committee *United* would not pay the 1% marketing fee because United questioned its legality.[2]

[¶ 9] He opened separate bank accounts for ICB funds and designated United and Kent Financial as cosignatories on the accounts. He then began to calculate, bill, and collect premiums. In January and May of 1991, he

1. Following revocation of his license, Kent transferred his interest in Kent Insurance to his wife, who became a licensed insurance agent in 1995, which was after this controversy arose and this investigation began.

2. Although United was aware Kent was paying the marketing fee from his 8% administration fee, United never made a direct payment to ICB.

deposited funds received from United into these accounts.

[¶ 10] Despite ongoing negotiations, the agreement between Kent and United was never finalized. Impasse occurred when United drafted an ASO agreement listing ICB as the policyholder, which Kent refused to sign unless he was designated policyholder of the plan.

[¶ 11] In August of 1991, the Division of Insurance (Division) wrote to United, requesting an explanation regarding the cancellation of the ICB health insurance policy, as the proper forms had not been filed. United informed Kent of the letter, prompting him to travel to Omaha on August 23, 1991. At that meeting, United learned for the first time that he did not have unbridled control of the plan and that ICB was not aware of the self-insured plan. He informed United the banks would leave the plan if they learned the policy was self-insured and that he could not or would not tell the banks they were self-insured.

[¶ 12] After that meeting, United and Kent began to negotiate an agreement where the plan would retroactively be made fully-insured for the 1991 policy year. On November 25, 1991, two agreements were executed—a deposit premium agreement and a terminal liability agreement. Embodied in these agreements was a provision requiring ICB to indemnify and hold harmless United should an action be brought against United relating to a violation of the Employee Retirement Income Security Act (ERISA) or any other federal or state law.[3] Although Kent represented he was acting under authority to sign, ICB was unaware of the negotiations or the agreements.

[¶ 13] As part of the two agreements, Kent was required to account to United for the premium income which was under his control. Only then did United learn that in addition to the 8% administration fee, Kent Financial was paying itself $10,000 each month. Prior to that, the only compensation authorized by United was the 8% administration fee in the service agreement. Apparently, United later approved the additional $10,000 per month as Kent Financial's compensation for 1991.

[¶ 14] ICB terminated Kent effective January 1, 1992. That decision was based, at least in part, on his refusal to pay the marketing fee. The Division filed notice of hearing on February 17, 1994, alleging various acts of misconduct and illegal transactions on his part. An administrative hearing was held on December 20 and 21, 1994. The Administrative Law Judge (ALJ) recommended to Darla Lyon, Director of the Division (Director) that Kent's insurance license be revoked. Director revoked his license on August 21, 1995.[4] The circuit court affirmed. Kent appeals.

[¶ 15] Generally, our standard of review is:

This court's standard of review of administrative appeals is clearly defined. We will overrule an agency's findings of fact only when they are clearly erroneous. The question is not whether there is substantial evidence contrary to the agency finding, but whether there is substantial evidence to support the agency finding. In other words, even if there is evidence in the record which tends to contradict the Department's factual determination, so long as there is some "substantial evidence" in the record which supports the Department's determination, this court will affirm. Great weight is given to the findings made and inferences drawn by an agency on questions of fact. Conclusions of law are given no deference and are fully reviewable.

---

3.  In a February 7, 1991 letter, United informed Kent that the self-insured plan might be in violation of ERISA and that under South Dakota law, he might be regarded as operating an insurance company without a license.

4.  Kent sought, and was granted, a stay of the revocation pending appeal to the circuit court. The effect of the stay was to permit him to continue as an insurance agent for slightly more than four months, until the circuit court upheld the revocation. The revocation was not final, then, until January of 1996. It is unclear from the record how many insurance companies he was associated with during that time; at least six terminated their contracts with him shortly after the Division filed notice of hearing in February, 1994.

*Hendrix v. Graham Tire Co.,* 520 N.W.2d 876, 878–79 (S.D.1994) (citations and internal quotations omitted). We have modified that standard of review with respect to professional licenses:

> The general burden of proof for administrative hearings is preponderance of the evidence. We are inclined to adhere to this general principle with the following exception. In matters concerning the revocation of a professional license, we determine that the appropriate standard of proof to be utilized by an agency is clear and convincing evidence.
>
> . . . .
>
> The quality of proof to be clear and convincing is somewhere between the rule in ordinary civil cases and the requirements of our criminal procedure, that is, it must be more than a mere preponderance but not beyond a reasonable doubt.

*In re* Zar, 434 N.W.2d 598, 602 & n. 7 (S.D.1989) (citations and internal quotations omitted). Kent argues Director violated certain provisions of SDCL 1–26–36, which provides, in relevant part:

> The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> . . . .
>
> (3) Made upon unlawful procedure;
>
> (4) Affected by other error of law;
>
> (5) Clearly erroneous in light of the entire evidence in the record; or
>
> (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

GENERALLY, THE ISSUE IS WHETHER KENT'S CONDUCT VIOLATED THE SOUTH DAKOTA INSURANCE CODE, AND IF SO, WHETHER HIS CONDUCT WARRANTED REVOCATION OF HIS LICENSE.

[¶ 16] 1. **Whether Kent violated SDCL 58–8–1.**

■ [¶ 17] The Director found Kent violated SDCL 58–8–1 by acting as an agent for an unauthorized insurer that did not have a certificate of authority to transact insurance in South Dakota. That statute provides:

> No person shall in this state, directly or indirectly, act as agent for, or otherwise represent any insurer not then authorized to transact insurance business in this state, in the solicitation, negotiation or effectuation of insurance or of annuity contracts, inspection of risks, fixing of rates, investigation or adjustment of losses, collection of premiums, or in any other manner in the transaction of insurance business with respect to subjects of insurance resident, located or to be performed in this state. Violation of this section is a Class 2 misdemeanor.

■ [¶ 18] Kent claims that because the self-insured policy was never reduced to written form it never actually existed. That argument is without merit. The self-funded arrangement was consummated by him when he used his Kent Financial bank account as the medium through which premiums and claims were processed. It is immaterial that the policy was never written because the statute encompasses conduct occurring before an agreement becomes written: "Insurance business" is defined as including "the transaction of all matters pertaining to a contract of insurance, *both before and after* the effectuation of that contract, and all matters arising out of that contract or any claim thereunder[.]" SDCL 58–1–2(11) (emphasis added). By funneling the insurance business through Kent Financial, an entity not licensed to transact insurance business, he was acting as an agent for an unauthorized insurer in violation of SDCL 58–8–1.

[¶ 19] After January 1, 1991, ICB was responsible for loss up to a sum certain, at which point the stop-loss coverage with United would take effect. The plan fit the definition of "self-insurance":

> The practice of setting aside a fund to meet losses instead of insuring against such through insurance. A common practice of business is to self-insure up to a certain amount, and then to cover any excess with insurance.

*Black's Law Dictionary* 1360 (6th ed 1990). Kent calculated, billed, and collected premi-

ums from employees of member banks on behalf of ICB in order to administer the self-insured plan. Pursuant to the 1990 fully-insured plan, he forwarded collected premiums to United; in 1991, he deposited those premiums in a Kent Financial bank account in order to implement the self-insured plan. Whether ICB knew it or not, Kent made ICB a self-insurer, a status unauthorized by ICB.

[¶ 20] Kent claims United "unilaterally" switched the plan to a self-insured policy. This contention is not supported by the record. As early as the fall of 1990, he was negotiating with United to institute a self-insured plan. He never informed ICB of these negotiations, nor did he inform United that he was acting without authority. It was not until August of 1991 that he finally told United that he was not in control of the policy and that he could not tell ICB it was self-insured because all of the member banks would leave the plan.

[¶ 21] Kent claims the 1990 fully-insured policy was still in effect because United never complied with that policy's 30-day written notice of cancellation provision. United did not directly convey notice to ICB that the policy had been switched to a self-insured plan; however, he knew of the change because he requested it. "As against a principal both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other." SDCL 59–6–5. In these circumstances, he was an agent not only for United, but for ICB as well. He cannot now blame United when it was his responsibility to inform ICB of the substantive change in its insurance coverage. Even if Kent believed the fully-insured plan remained in force throughout 1991, Division's inquiry into its cancellation should have prompted him to immediately inform ICB. Any claim the original policy remained effective is undermined by the execution of the two agreements bearing Kent's signature, which made the plan retroactively fully-insured. Additionally, ICB wanted the peace of mind of insurance protection, not the uncertainty of litigation to establish that protection, or the risks involved in self-insurance.

[¶ 22] There is substantial evidence in the record to support the Director's finding that Kent acted as an agent for an unauthorized insurer in violation of SDCL 58–8–1.

[¶ 23] **2. Whether Kent violated SDCL 58–30–32.**

[¶ 24] The Director found Kent violated SDCL 58–30–32 by transacting insurance business through Kent Financial, which did not hold a corporate insurance license. That statute provides, in part:

A firm or corporation ... must be licensed if one of its principal functions is the transaction of insurance or if it receives any commission or other compensation dependent upon the placement of insurance.

Kent prefers to refer to Kent Financial as a "clearinghouse" for the payment of claims or as a "plan administrator." We are not persuaded by the name game. The record is replete with evidence Kent Financial had as one of its principal functions the transaction of insurance. SDCL 58–1–2(11) once again defeats his claims. That statute provides the definition of "insurance business" as including "the transaction of all matters pertaining to a contract of insurance, both before and after the effectuation of that contract, and *all matters* arising out of that contract or *any claim* thereunder[.]"

[¶ 25] Kent Financial managed a group health plan.[5] It calculated, billed, and collected premiums. The Kent Financial bank account was used to process premiums and claims. Kent Financial received an administration fee and paid itself an additional unauthorized $10,000 from that account every month.[6] There is substantial evidence in the

---

5. Kent Financial provided the following administrative services during 1990: 1) Producing and distributing premium notices, collecting and depositing premiums; 2) submitting monthly premium reports to United; 3) providing termination notices to employers for nonpayment of premiums; 4) enrolling and securing evidence of insurability for new employees; 5) mailing claim forms to employees; and 6) handling customer service inquiries.

6. The 8% administration fee and the additional $10,000 amounted to $20,000 per month re-

record to support the Director's finding that Kent Financial conducted the business of insurance without a license, and received compensation for doing so, in violation of SDCL 58–30–32.

**[¶ 26] 3. Whether Kent violated SDCL 58–30–106(6) & (7).**

[¶ 27] The Director found Kent violated certain provisions of SDCL 58–30–106 which provides, in relevant part:

> The director may suspend for not more than twelve months, or may revoke or refuse to continue any license issued under this chapter ... [if] he finds that as to the licensee any one of the following causes exists:
>
> . . . .
>
> (6) For material misrepresentation of the terms of any insurance contract or proposed insurance contract; or
>
> (7) If in the conduct of his affairs under the license the licensee has used fraudulent or dishonest practices, or has shown himself to be incompetent or untrustworthy.

The Director concluded Kent violated these provisions through

> misrepresentations and by using fraudulent and dishonest practices in connection with the establishment and operation of the self-funded health plan in 1991. Kent had a fiduciary duty to ICB to disclose the material facts regarding the self-insured plan and his deliberate concealment of the facts amounts to misrepresentation and use of fraudulent and dishonest practices.

[¶ 28] Kent claims this conclusion is inconsistent with other findings made by the Director. He argues because the Director found that the agreement was never written, and because he rejected the version United proposed, that there was *nothing to disclose* to ICB. This ignores the reality that ICB *was* operating under a self-funded plan, Kent knew it, and he *never* informed the ICB board of directors.

[¶ 29] ICB instructed Kent to replace the fully-insured policy provided by Central with a similar version. Unauthorized conversion of the original United policy to a self-funded plan was a breach of his fiduciary duty to ICB and was exacerbated by his nondisclosure to ICB. "An agent must use ordinary diligence to keep his principal informed of his acts in the course of the agency." SDCL 59–4–1. *See also Swanson v. Sioux Valley Empire Elec. Ass'n, Inc.*, 535 N.W.2d 755, 758 (S.D.1995) ("All insurance contracts contain an implicit contractual duty to act or deal in good faith.") (citation omitted).

[¶ 30] When Kent and United met in August of 1991 to retroactively alter the self-insured plan to a fully-insured policy, he never informed ICB of his activities. Although he represented to United that he had the authority to enter into the two agreements to effect that course of action, he had not informed ICB of his activities and was without authority to sign the agreements.

[¶ 31] Kent claims since there was no "legal injury" to ICB there can be no finding of fraud. He argues ICB received "exactly what it contracted for: quality coverage at reasonable rates." He is focusing on "the wrong part of the transaction." *State v. Hurst*, 507 N.W.2d 918, 922 (S.D.1993) (finding unpersuasive defendants' argument that in the absence of financial loss there could be no victim of their fraudulent behavior). "A matter can have 'pecuniary significance' without resulting in a financial loss." *Id.* (citation omitted).

> They direct attention to what the victim obtains. The gist of the offense, however, is concerned with what the defrauder obtains. Once the victim has parted with his property in reliance on a false representation, it is immaterial whether whatever he got in return is equal in exchange value to that with which he parted.

*Id.* (quoting *Arizona v. Mills*, 96 Ariz. 377, 396 P.2d 5, 8 (1964)).

> A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value. It may be impossible to measure his loss by the gross scales available to a court, but he has suffered a

ceived by Kent Financial while the self-insured plan was in effect.

wrong; he has lost his chance to bargain with the facts before him.

*Id.* (quoting *United States v. Rowe,* 56 F.2d 747, 749 (2d Cir.), *cert. denied,* 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289 (1932)). *See also Coffey v. Polimeni,* 188 F.2d 539, 543 (9th Cir.1951) ("Implicit in the cases [imposing on agents a duty to act promptly in procuring insurance and in notifying if it is not procured] is a recognition that these transactions are fundamentally unlike ordinary commercial or business dealings where mere profit is the stake, so prone is the failure of insurance protection to result in irretrievable disaster. . . .").

[¶ 32] There is substantial evidence in the record to support the Director's finding that Kent violated SDCL 58–30–106(6) and (7).

[¶ 33] 4. **Whether Kent violated SDCL 58–30–88.**

■■■ [¶ 34] The Director concluded Kent violated SDCL 58–30–88 by failing to remit certain checks to ICB. SDCL 58–30–88 provides: "All premiums or return premiums received by an agent shall be trust funds received by the licensee in a fiduciary capacity, and the agent or soliciting agent shall account for and pay the same to the insured, insurer or agent entitled thereto." He claims this was error because the ALJ failed to find evidence of commingling or conversion of the funds. "It is well-settled that an administrative agency is not bound by a hearing examiner's findings of fact, conclusions of law, and recommendations." *Zar,* 434 N.W.2d at 601 (citation omitted). What the Director must do is arrive at an "independent conclusion" while keeping the proper standard of proof in mind. *Id.* at 601–02.

[¶ 35] The Director found Kent never set up trust fund accounts for these checks, nor for the premiums he collected in 1991. The checks were indorsed and deposited into the Kent Financial account. The checks were made payable to ICB, yet he did not timely inform ICB of their existence.

[¶ 36] *In re Gridley,* 345 N.W.2d 860 (S.D. 1984), discusses SDCL 58–30–38 and the cus-

tomary standards of the insurance industry regarding returned premiums: 1) The agent must return a premium to a customer immediately after the completion of a final audit; and 2) the agent must forward a premium refund to a customer even while the agent and the insurance company dispute the amount. *Id.* at 863.

[¶ 37] The policy issued by United was "experience-rated," meaning that for each policy year, after a 15–month accounting period, United would refund to the insured all or part of any excess premiums (the premiums paid minus the claims paid and expenses). In a policy year where claims exceeded the premiums paid, the deficit would be rolled forward to offset any future refunds. United personnel testified the checks represented both an experience refund and claim reserves for the 1990 year. Although testimony showed the final accounting normally takes the full 15 months, the money was issued immediately because the self-insured arrangement was effective January 1, 1991, and ICB was thus at risk for all of its claims. According to *Gridley,* the funds should have been remitted to ICB immediately upon receipt by Kent. 345 N.W.2d at 863. In *Gridley,* the failure of the agent to immediately refund a premium justified Division's revocation of Gridley's license for breach of the fiduciary duty embodied in SDCL 58–30–88. *Id.* at 861, 864. These "fiduciary obligations . . . were designed to effectuate a public policy of protecting both insurers and policyholders from the mishandling and dissipation of premium payments." *Middlesex Ins. Co. v. Mann,* 124 Cal.App.3d 558, 177 Cal.Rptr. 495, 503 (1981) (construing similar statutes under California insurance law) (citations omitted).

[¶ 38] Kent claims he is somehow absolved because he paid the funds back to United in December of 1991 in accordance with the agreements which made the policy retroactively fully-insured. Assuming the agreements only obligated him to return the monies to United, that would not change the fact that they were owed to ICB *upon receipt* in January and May of 1991.[7]

---

7. The January, 1991 check was in the amount of $150,000 and the May, 1991 check was for

$183,910. Although the checks were made payable to ICB, Kent held the funds for approxi-

[¶ 39] Kent further claims ICB should be satisfied with the "unprecedented" refund of $167,000. We disagree. It is simply further evidence of his lack of diligence in keeping ICB abreast of its own insurance plan; for example, ICB was not even informed that the 1990 plan was experience-rated.

[¶ 40] There is substantial evidence in the record to support the Director's finding that Kent violated SDCL 58–30–88 by failing to remit these checks to ICB.

[¶ 41] **5.  Whether Kent violated SDCL 58–30–12.**

[¶ 42] The Director found Kent violated the Insurance Code by placing insurance with United before United appointed him as an agent. SDCL 58–30–12 prohibits this practice: "An agent shall place insurance only in an insurer as to which he holds a subsisting appointment as agent pursuant to this chapter. Violation of this section is a Class 2 misdemeanor." Before an insurance agent is allowed to place insurance with an authorized insurer, the insurer must seek approval from the Director for the appointment of that agent. SDCL 58–30–6. The appointment is not effective until the date it is processed by the Division. *Id.* Appointments for Kent and Kent Insurance were not effective until February 8, 1990, and Kent Financial was never licensed or appointed.[8]

[¶ 43] SDCL 58–30–12.1 provides an exception, which Kent claims applies to him:

An agent licensed for life or health insurance, or both, may place excess or rejected life or health insurance or annuity risks with any authorized insurer other than an insurer the agent is licensed to represent; but the agent may not receive commissions *or other compensation* from such other insurer for the business so placed until after he has been appointed an agent of the insurer in accordance with this title.

(Emphasis added). He argues because Central terminated coverage based upon its desire to leave the group health insurance market, that constituted "rejection"[9] of ICB's business.

[¶ 44] Although he did not actually receive his first administration fee until February 14, 1990 (six days after his appointment with United became effective), Kent d/b/a Kent Financial entered into a service agreement with United on March 5, 1990, retroactively effective January 1, 1990. This agreement named Kent Financial as the administrator of the policy, and provided that Kent Financial would receive 8% of the policy premiums for handling the administration of the ICB plan. Even while acknowledging the agreement, the Director specifically found Kent did not receive a commission for the 1990 policy. While he may not have received a "commission" for the 1990 policy, he did receive "compensation" via the retroactive agreement—reason enough to exclude him from the exception found in SDCL 58–30–12.1.[10] Therefore, there is substantial evidence in the record to support the finding

---

mately 11 months without notifying ICB of their existence. In fact, there was testimony that he diverted $183,910 to his own Merrill Lynch investment account within five days of receiving the May check.

Kent claims the Director's conclusions are inconsistent because on the one hand, she found that he used these funds to pay incurred claims, and yet went on to find he violated the statute by failing to remit the monies to ICB. It is irrelevant for purposes of determining whether the statute was violated that he paid the claims. As noted in the textual discussion, the checks should have been turned over to ICB immediately. In any event, the testimony regarding the diversion of funds to Kent's Merrill Lynch account went uncontroverted and supports the Director's finding that failure to remit the checks to ICB was evidence of "dishonesty, lack of trustworthiness, morals, integrity and financial responsibility."

8.  Kent's motives for not conducting all insurance business through Kent Insurance, which he owned and controlled and which had been licensed to transact insurance business in South Dakota for over a decade, remain unexplained in this record.

9.  " 'Rejected business' is a risk that an insurer then represented by the agent has rejected for underwriting reasons, or is willing to accept only on a substandard basis; but which business will be accepted and issued by another authorized insurer at a lower rate." SDCL 58–30–1.2.

10.  Because the exception does not apply to Kent, it is immaterial whether Central's actions constituted "rejection" under SDCL 58–30–12.1 or 58–30–1.2.

that Kent violated SDCL 58–30–12 when he placed insurance, and received compensation for that placement, prior to being appointed by United.

**[¶ 45] 6. Whether Kent violated SDCL 58–33–14.**

[¶ 46] The Director found Kent paid ICB an illegal rebate of premiums as prohibited by SDCL 58–33–14, which provides:

> Except as otherwise provided by law, no person shall knowingly permit or offer to make or make any contract of life insurance, life annuity or health insurance, or agreement as to such contract *other than is plainly expressed in the contract* issued thereon, or pay or allow, or give or offer to pay, allow, or give, directly or indirectly, as inducement to such insurance, or annuity, *any* rebate of premiums payable on the contract.... Violation of this section is a Class 2 misdemeanor.

(Emphasis added). Kent claims because he and a member of the ICB board of directors "performed legitimate services" [11] in exchange for the 1% marketing fee, he did not violate the statute. First, it is unclear how *Kent* can work for the fee that *Kent* is paying ICB. Next, his assertion that consideration was given for the fee is not a defense, but an admission. The fact that consideration was given, or may have been given, for the rebate does not create an exception to the statute.

[¶ 47] Although this court has not interpreted this statute until now, other jurisdictions with similar statutory provisions generally agree upon the purpose behind the anti-rebate statutes. See *Katt v. Insurance Bureau*, 200 Mich.App. 648, 505 N.W.2d 37 (1993), which upheld the constitutionality of the anti-rebate statute on several grounds. The court held the discrimination between similarly situated individuals presenting the same risk profile is prohibited as an unfair method of competition and a deceptive trade practice. *Id.* 505 N.W.2d at 40. The court also noted the anti-rebate statutes promote insurer solvency and the public convenience

in comparison of insurance costs. *Id. See also* Tracy A. Bateman, Annotation, *Insurance Anti–Rebate Statutes: Validity and Construction,* 90 A.L.R.4th 213, 220 (1991) (collecting cases and listing purposes behind the statutes as the prevention of unfair discrimination among insureds of the same class, protection of the solvency of insurers, protection of quality of service, avoidance of concentration of the market in a few insurance companies, and the avoidance of unethical sales practices) (citing Adamec, *Premium Rebating: An Unnecessary Evil,* 39 Fed'n Ins & Corp Couns Q 3 (1988)).

[¶ 48] Kent claims *he* did not pay the 1% marketing fee because the money was directly traceable to United.[12] The precise account from which the payment was made is irrelevant; the 1% marketing fee rebated to ICB *by Kent* represented a portion of the policy premiums paid by ICB. The 1% fee had no direct relationship to any actual expenses incurred by ICB that would otherwise have been paid by Kent Financial or United in administering or servicing ICB's insurance program. The marketing fee was not stated in the contract of insurance. Such a rebate of premiums is clearly prohibited by SDCL 58–33–14, and there is substantial evidence in the record to support the Director's finding that Kent violated SDCL 58–33–14 by paying the 1% "marketing" fee.

**[¶ 49] 7. Whether the Director violated agency regulations when she assessed Kent's penalty.**

[¶ 50] Kent claims the Director violated Division regulations by not considering every factor in ARSD 20:06:01:02, which provides:

> In determining the penalty for a violation of an insurance law by an agent, broker, or insurer, the director may consider, but is not limited to, the following factors:
>
> (1) Prior violations of the law by the agent, broker, or insurer;
>
> (2) Number of violations of a statute;
>
> (3) Number of statutes violated;

---

11. Kent claims that he and ICB earned the fee by enrolling member banks and advertising the plan in the ICB newsletter.

12. As indicated above, Kent paid the 1% marketing fee by taking it from the 8% administration fee which United paid to him.

(4) Penalties assessed against other agents, brokers, or insurers for the same violations;

(5) Magnitude of the harm to the public and insured; and

(6) Any mitigating circumstances.

[¶ 51] He complains the Director did not consider any mitigating circumstances and asserts a strained interpretation of the word "may" as used in the statute. He claims "may" means "shall" in this instance, and that any other translation would render the regulation "meaningless." He relies on *Person v. Peterson*, 296 N.W.2d 537 (S.D.1980), for our statement that "the word 'may' in a statute should be construed in a permissive sense unless the context and subject matter indicate a different legislative intent." *Id.* at 538 (citations omitted). What he fails to provide is proof that the context or the subject matter evince a contrary legislative intent. There may be instances where "may" is more properly read as "shall," but this is not one of them.

**[¶ 52] 8. Whether revocation of Kent's license was too severe a penalty.**

[¶ 53] Kent claims the consideration of all the factors listed in ARSD 20:06:01:02 makes it "clear" that revocation was too severe a penalty. We disagree. A review of those factors supports the Director's revocation of his license:

(1) *Prior violations of the law by the agent, broker, or insurer:* Kent committed one prior violation since 1973, which resulted in a consent decree, where he was ordered to be placed on probation for six months and to pay a $100 fine;

(2) *Number of violations of a statute:* Kent violated two subsections of SDCL 58–30–106;

(3) *Number of statutes violated:* Kent violated seven statutory provisions: SDCL §§ 58–8–1, 58–30–12, 58–30–32, 58–30–88, 58–30–106(6), 58–30–106(7), and 58–33–14.

(4) *Penalties assessed against other agents, brokers, or insurers for the same violations:* The agent in *Gridley* lost his license for violating *one* statute (SDCL 58–30–88). This court found revocation to be

justified in that case. 345 N.W.2d at 864. Kent wants this court to look only to the fine of $42,500 assessed United; however, United's conduct was far less egregious than his. Moreover, the Director has the discretion to impose a monetary fine in lieu of revocation. SDCL 58–4–28.1.

(5) *Magnitude of the harm to the public and insured:* The potential for harm to the insured was great. *See, e.g., F & M Agency v. Dornbush,* 402 N.W.2d 353 (S.D. 1987) (administrator of a self-insured group health insurance plan for bank depositors filed for bankruptcy, resulting in unpaid claims totalling $60,000).

(6) *Any mitigating circumstances:* Kent claims the Director ignored the existence of mitigating circumstances, while the ALJ specifically considered them. What he fails to mention is that, although the ALJ found mitigating circumstances to be present, he *still* recommended revocation of his license. In view of the record, the aggravating circumstances easily outweigh the mitigating circumstances.

[¶ 54] Kent violated the South Dakota Insurance Code by: Acting as an agent for an unauthorized insurer; failing to remit the returned premiums; transacting unauthorized insurance business through Kent Financial; placing insurance with United (and receiving compensation for that placement) before United appointed him as an agent; and paying ICB an illegal rebate of premiums.

[¶ 55] Kent made material misrepresentations to United about his authority; he fraudulently concealed material facts from the ICB with regard to the group's insurance; he clearly evinced a dishonesty in the manner in which he conducted his affairs. Such misrepresentations, fraud, and dishonesty demonstrate that he is untrustworthy and justify the Director's revocation of his license under SDCL 58–30–106(6) & (7). The Director had the authority to revoke his license by finding a material misrepresentation *or* fraudulent practices *or* dishonest practices *or* incompetency *or* untrustworthiness. *Id.* The Director found material mis-

representations, fraudulent and dishonest practices, and untrustworthiness by clear and convincing evidence. The finding of one may have sufficed; [13] the finding of four justifies affirmance of revocation of Kent's license. Based upon the record and the law before us, we conclude that the penalty of revocation was not shown to be improper.

[¶ 56] Affirmed.

[¶ 57] MILLER, C.J., and AMUNDSON, KONENKAMP, and GILBERTSON, JJ., concur.

**13.** The Director's authority to revoke under any of these circumstances is specifically provided in SDCL 58–30–106, *supra* at ¶ 27; it is further bolstered by SDCL 58–30–23, which provides, in relevant part: "Any individual licensed as an agent shall be trustworthy, of good character and reputation as to morals, integrity, and financial responsibility[.]" *See also* SDCL 58–30–21, which provides: "For the protection of the people of this state, the director *shall not* issue, continue or permit to exist any agent's license except in compliance with this chapter, or as to any person not qualified therefor as provided by §§ 58–30–22 to 58–30–28, inclusive." (Emphasis added). *Accord Friedland v. Curiale,* 192 A.D.2d 387, 596 N.Y.S.2d 41, 42 (N.Y.App.Div. 1993) (finding revocation of insurance licenses appropriate when agents conducted business under a fictitious entity, solicited business on behalf of unlicensed insurers, commingled funds, and failed to exercise their fiduciary responsibilities to policy holders).