Unified Judicial System

 

 
 Michael J. McGill, Conservator and Guardian for Bernice G.J. Thissell
Plaintiff and Appellant v.
American Life and Casualty Insurance Company a/k/a Conseco Company, Dean Nordseth, and Ennis E. Lund Defendants and Appellees
and James D. Thissell, Charles W. Thissel, and David R. Thissell
Defendants [2000 SD 153]
South Dakota Supreme Court
Appeal from the Circuit Court of The Second Judicial Circuit
Lincoln County, South Dakota
Hon. Richard Bogue, Judge
Jonathan K. Van Patten, Vermillion, South Dakota
Robert J. Burns, Burns Law Firm, Sioux Falls, South Dakota
Robert A. Christenson, Sioux Falls, South Dakota
Attorneys for plaintiff and appellant
 
Robert C. Riter, Jr., Riter, Mayer, Hofer, Wattier & Brown, Pierre, South Dakota
Steven K. Huffer, Huffer & Weathers, Indianapolis, Indiana
Attorneys for defendants and appellees American Life and Casualty Insurance Company
John E. Simko, Woods, Fuller, Shultz & Smith, Sioux Falls, South Dakota
Attorneys for defendant and appellee Ennis E. Lund
 
Argued April 25, 2000, Reassigned October 17, 2000
Opinion Filed 12/13/2000
 
 
GILBERTSON, Justice (on reassignment).
[Â¶1.] Michael J. McGill, as Conservator and Guardian for Bernice G. J. Thissell, sued American Life and Casualty Company and two of its agents for negligence, negligent misrepresentation, fraud, deceit, breach of fiduciary relationship and breach of contract.  The circuit court granted summary judgment in favor of American Life, finding that as a matter of law, McGillâs claims were barred by the statute of limitation.  We reverse and remand for trial.
FACTS AND PROCEDURE
[Â¶2.] On September 2, 1986, American Life and Casualty Company (American Life) agents Dean Nordseth (Nordseth) and Ennis Lund (Lund) called on Bernice Thissell (Bernice), a 79-year-old widow.  Nordseth and Lund persuaded Bernice to purchase a âuniversal lifeâ insurance policy from American Life.  The policy required a single premium payment of $100,000 and had a death benefit of $200,000.[1]   These policies depend upon the interest generated by the initial payment to pay the premiums due under the policy.[2]   Before American Life would issue the policy, it required Bernice to undergo a medical examination.  This examination revealed possible heart problems.  As a result, the policy was re-rated and issued as âspecial class.â  This reclassification caused an increase of $49,111 in the premiums required to keep the policy performing as represented to Bernice.  The re-rating and subsequent increase in premiums was not revealed to Bernice or her family.  American Life issued the re-rated policy on November 13, 1986.
[Â¶3.] By 1988, it became apparent that the interest generated by the initial premium payment was not covering the cost of insurance.  In an attempt to correct the problem, Nordseth, Bernice, and her attorney, McGill agreed that the death benefit would be lowered to $190,000.  The lower death benefit would decrease the premiums required to keep the policy current.  In April of 1989, McGill again reviewed the policy due to increased concerns of Berniceâs family.[3]   After this review, McGill wrote a letter to Bernice, her sons and Nordseth, setting forth his observations as to the performance of the policy.[4]   In that letter, McGill expressed his belief that the policy was not paying for itself due to the decrease in interest rates during the life of the policy in addition to an overly high mortality charge.  It was McGillâs belief that because of the lower interest rates, the initial payment was not generating sufficient returns to pay the premiums.  At this time, McGill was not aware of the unilateral reclassification and subsequent premium increase performed by American Life.  McGill also inquired whether this policy could be converted to âpaid-up coverageâ and what the amount of that policy would be.  He specifically requested Nordseth to comment on the issues raised in the letter, but Nordseth did not do so.
[Â¶4.] On July 24, 1989, Bonnie Burns, an Insurance Specialist/Consumer Advocate, wrote a letter to Berniceâs son, Charles, after reviewing the policy at issue.  She shared McGillâs concerns as to the future funding of the policy and the effects of lower interest rates.  When giving her opinion, she was not aware of the unilateral re-rating and accompanying premium increase by American Life.
[Â¶5.] Berniceâs sons were named as attorneys in fact for Bernice on February 19, 1990.  In a letter to Charles in May of 1990, McGill warned that Berniceâs mail should be watched for the annual report from American Life.  This was necessary to âdetermine whether the return on the policy [was] paying the premium without consuming an excessive amount of cash value.â  On July 13, 1990, Bernice assigned the policy in question to her sons.  McGill was appointed as guardian and conservator for Bernice in September, 1997.
[Â¶6.] On April 17, 1998, McGill filed a complaint, on behalf of Bernice, against American Life, Nordseth and Lund alleging negligence, negligent 
misrepresentation, fraud, deceit, breach of fiduciary relationship, and breach of contract.  It was only after this complaint was filed that the re-rating and premium increase was discovered.  McGill now claims that the re-rating and premium increase was the reason that the policy did not perform up to expectations.  American Life, Lund and Nordseth filed motions for summary judgment, asserting that the statute of limitations barred McGillâs claims.  The trial court granted the motion and McGill appeals.
STANDARD OF REVIEW
[Â¶7.] When reviewing a trial courtâs decision to grant summary judgment, we will affirm only if all legal questions have been decided correctly and there are no genuine issues of material fact.  Holzer v. Dakota Speedway, 2000 SD 65, Â¶8, 610 NW2d 787, 791 (citations omitted).  The nonmoving party will receive the benefit of all reasonable inferences that can be drawn from the facts.  Id.  It is the responsibility of the moving party to demonstrate the absence of genuine issues of material fact.  Id. at 791-92.  Only if that burden is met will the moving party be entitled to judgment as a matter of law.  Id. at 792.  Additionally, summary judgment will be affirmed if it is correct for any reason.  Id.
ANALYSIS AND DECISION
[Â¶8.] The issue is whether Bernice or her agents knew of fraud or fraudulent concealment prior to April 17, 1992.  There are numerous questions of fact concerning the existence of fraud and fraudulent concealment and the period of time tolled under the applicable statute of limitations which makes summary judgment inappropriate.  
[Â¶9.] The duty of an insurance agent towards a client is set forth by statute.  Specifically prohibited are âmaterial misrepresentation of the terms of any insurance contract or proposed insurance contract,â âfraudulent or dishonest practices,â incompetence and untrustworthiness.  SDCL 58-30-106 (6), (7).  See Kent v. Lyon, 1996 SD 131, Â¶29, 555 NW2d 106, 113.  Nondisclosure to a client of a material change in a policy falls within this prohibited conduct.  Id.  âAll insurance contracts contain an implicit contractual duty to act or deal in good faith.â  Id.
[Â¶10.] The estate brought forth the following expert opinion testimony from Larry R. Swenson in opposition to defendantsâ motion for summary judgment:
This is probably one of the blatant abuses that Iâve seen of universal life.  Not only was the lady 79 years old, but thereâs evidence in the file that she really didnât understand her financial position, and what the agent and the manager did was take her an opportunity in a good, strong investment and put her in a high risk investment unless she died.
 . . . 
I think it was sold on greed, greed on the agentâs part and the managerâs part for the commissions, greed on the companyâs part for the mortality cost inherent in the policy and their limiting of risk . . . .
 . . .
My opinion is that Mrs. Thissell would never have bought this if she hadnât have been lied to or defrauded.  I assume that the fraud can be assumed to have been just leaving out some of the pertinent information, that if it had been relayed to her or her advisers that there would not have been any transaction made at that particular time.
 
The estate also submitted the affidavit of James Brick, an attorney, who reviewed the files and depositions of this case and concluded, âthe defendants, Lund, Nordseth and American Life and Casualty had to have misrepresented the nature, need, risks and benefits of the universal life policy in order to persuade Mrs. Thissell to purchase it.â
[Â¶11.] SDCL 15-2-3 states that fraud âshall not be deemed to have accrued until the aggrieved party discovers, or has actual or constructive notice of, the facts constituting the fraud.â  McGill did not become Berniceâs guardian and conservator until September of 1997.  Prior to that time he acted only as her attorney.  It was during that period of time that he authored the letters relied upon by American Life as evidence of his knowledge of fraudulent activity.  Therefore, before 1997, the âaggrieved partyâ was Bernice, not attorney McGill.  McGill testified as to his opinion of the limited nature of his representation of Bernice in this matter prior to 1997:
Bernice Thissell never asked me for my opinion at the time that she purchased the policy as to whether it was a wise investment or not.  I was not her investment advisor or financial counselor in 1986 when she purchased the policy.  She asked me to investigate whether it was true what Dean Nordseth stated that the growth in the policy was tax free and that there was no inheritance taxes upon her death.  She asked me about the stability of the company.  She did not ask me if I thought that it was a good investment.  So, too, in 1989 when I wrote the letter, I was setting forth my observation as a matter of fact.  I was not her financial advisor or investment advisor and she did not rely upon me as such.  She did not consult with me and ask me for my opinion in 1989 at the time that I wrote the letter about whether she had a cause of action for negligence and fraud in connection with Nordsethâs and Lundâs investment advice at the time they sold the policy to Bernice.
 
A lawyerâs acceptance of employment and corresponding charges therefore cannot exceed the scope of the employment agreed to by the client.  In re Discipline of Dorothy, 2000 SD 23, 605 NW2d 493; Matter of Estate of Schuldt, 428 NW2d 251 (SD 1988).  Clearly, prior to 1997, Bernice relied upon McGill only for legal advice and not as guardian of her finances.  McGillâs testimony is re-inforced by that of Swenson who testified, âthat if [the pertinent information] had been relayed to her or her advisers that there would not have been any transaction made at that particular time.â  
[Â¶12.] Thus, the issue of constructive notice should focus primarily upon Bernice, who in 1986 was a 79-year-old widow and housewife.  The record establishes that by 1990, Berniceâs mental state was such that she could not be relied upon to recognize the significance of her own mail.  In May of that year, McGill wrote her son âwe must watch Berniceâs mail for the annual report on the single premium life insurance policy.â  What Bernice knew, when she knew it and whether she was able to understand the effect of that knowledge are questions of fact to be determined by a jury.  
[Â¶13.] Defendantâs counter that even if fraud is assumed, the Thissell sons and McGill had access to facts that would expose the fraud during the period of 1986-89.  Defendants point out that the Thissell sons became owners of the policy in 1990.[5]   What the sons knew, and when they knew it are likewise, questions of fact to be determined by a jury.  It is clear that by 1989-90, McGill and the Thissell sons were aware of the âinterest-sensitive nature of the insurance policy.â  They knew that the interest from the premium payment was not covering the cost of insurance.  However they, as well as Bernice, were not aware of the re-rating and premium increase, which the estate argues is the real reason for the problem with the policy.  The estate also alleges that the unilateral increase in the premium without disclosure of the same or the impact it would have on the cash value of the policy constituted a âbait and switchâ scheme.  McGill summarized why, in his opinion, he and the Thissells did not pursue the matter during the 1986-89 period:
In 1989 when I wrote the letter I did not think that a cause of action existed for fraud in connection with the policy because I was not aware of anything fraudulent or misleading that was done by Nordseth or Lund at the time that the policy was sold.  I did not know that Dean Nordseth took steps to cash in Berniceâs other investments to secure the cash for the purchase price, such as writing letters to the other investment houses to liquidate assets.
In order for a cause of action to have been discovered Bernice Thissell and her three sons would have had to know that they had sustained damages as a result of anotherâs wrongful conduct and that they knew the identity of the person or entities that caused those damages.  As of 1989 it would have been impossible for Bernice or her children, as well as I, to know that premium was artificially high.  The only people that knew about the non standard rate were the Defendants.  Likewise, it was not until the conservatorship estate was created and the lawsuit started that the family and I learned of the importance of properly funding the policy at the outset.  We did not know these facts in 1989. 
Moreover, in 1989 when I wrote the letter to Bernice and her sons and to Nordseth, I was passing on my observations and asking for guidance and advice from the insurance expert (Nordseth) that sold the policy to begin with.  Bernice relied upon and trusted Nordseth as made evident by her purchase of the policy in litigation as well as the purchase of additional policies from Nordseth after the single premium policy.
  
Thus, not only had Bernice relied upon Nordseth as the fiduciary expert on this insurance matter, but so did her attorney, McGill, and her sons.[6]   
[Â¶14.] The 1989 letter of McGill expressed his belief that the shortfall had been due to decreasing interest rates and expressly requested Nordseth to comment on the situation.  Nordseth, however, chose to remain silent, never revealing the re-rating and premium increase.  If a statutory duty exists to not misrepresent the terms of a policy, and prohibits fraudulent, dishonest, incompetent or untrustworthy practices via SDCL 58-30-106 (6) and (7), then an agent is clearly under a duty to speak to avoid these practices.  Kent, 1996 SD 131, Â¶29, 555 NW2d at 113.  Whether that occurred in this case is a question of fact.  More specifically, whether Nordsethâs nondisclosure rose to the level of fraudulent concealment is a question of fact.  Whether the extent of this reliance upon Nordseth was justified, is an additional question of fact.
[Â¶15.] It could be that a jury may view the documents and other evidence and conclude there was no fraud or fraudulent concealment, or if there was, that the Thissells and McGill were put on constructive notice more than six years ago that fraud or fraudulent concealment existed.  However, a jury may not.  A jury should be allowed to determine the nature of the relationship between Nordseth, McGill, Bernice, and her sons as well as what they all knew or should have known, and 
when they knew it.  Therefore, the circuit courtâs order granting summary judgment in favor of the defendants is reversed and remanded for trial. 
[Â¶16.] MILLER, Chief Justice, and AMUNDSON and KONENKAMP, Justices, concur.
[Â¶17.] ECKRICH, Circuit Judge, dissents.
[Â¶18.] ECKRICH, Circuit Judge, sitting for SABERS, Justice, disqualified.
 
ECKRICH, Circuit Judge (dissenting).
 
[Â¶19.] I respectfully dissent.
[Â¶20.] On November 13, 1986, McGill wrote to American Life regarding the policy.  He sought financial information about the company to better âenable [him] to advise her of the prudence of investing all of her assets into your insurance company.â
[Â¶21.] Over the course of the next two and one half years, McGill read the insurance policy, received a policy statement, met with Mrs. Thissell and agent Nordseth regarding the policy and communicated with Mrs. Thissellâs son Charles regarding the policy.
[Â¶22.] On April 26, 1989, McGill wrote a letter to Mrs. Thissell, her three sons and Nordseth that provided, in pertinent part:
On June 20, 1988 the death benefit of this policy was reduced to $190,000.00.  The reason for this was because interest rates had decreased and the mortality charge on the premium was too high.  .  .  .  My two concerns on the policy, and Mr. Nordseth is free to comment on these in any letter that he has in response to this letter, is what is the interest payable on the policy and whether it is possible to convert this policy to paid-up coverage in a certain face amount so that there would be no further mortality charge or premiums due on the policy.  .  .  .  If it were converted to paid-up insurance, there would be no risk in the mortality charge consuming the principal.
 
The letter included a copy of American Lifeâs 1988 policy report.
[Â¶23.] On July 24, 1989, Bonnie Burns, an Insurance Specialist/Consumer Advocate, wrote a letter to Mrs. Thissellâs son Charles, an attorney, following her review of several of Mrs. Thissellâs insurance policies.  The letter reiterated the risks associated with the American Life policy and suggested the âfuture funding of this plan deserves serious consideration and .  .  . the attention of someone with more experience than [she had] in the field of life insurance and financial planning.â  In addition, Ms. Burns advised:
If you want to pursue disciplinary action against the agent I will need to examine the code for South Dakota.  If the sale of any of these coverages was fraudulent or made under duress or high pressure, or if twisting is involved, you may be able to involve one of the companies.  It would seem clear to me that the actual damages pursuant to the sale of the health insurance products are not very high and may not be worth your time and energy.  The life insurance sale is another matter.  It might be interesting to ask for an opinion from the South Dakota department of insurance on the merits of that sale.
 
[Â¶24.] The insurance policy was assigned to Mrs. Thissellâs sons in 1990.  On February 19, 1990, Mrs. Thissell named her sons as attorneys in fact âto deal with life insurance.â  On May 16, 1990, McGill wrote to Charles:  âwe must watch Mrs. Thissellâs mail for the annual report on the single premium life insurance policy.  We have to determine whether the return on the policy is paying the premium without consuming an excessive amount of cash value.â
[Â¶25.] On April 17, 1998, McGill filed a complaint on Mrs. Thissellâs behalf against American Life, Nordseth and Lund alleging negligence, negligent misrepresentation, fraud, deceit, breach of fiduciary relationship, and breach of contract.
[Â¶26.] The substance of McGillâs claims is two-fold:  1) that the insurance product Mrs. Thissell purchased was an entirely inappropriate and risky investment considering her modest estate and advanced age; and 2) that American Life and its agents did not disclose the risky, interest-sensitive nature of her investment, i.e., that her policy âcould self-destruct if interest rates continued to decline.â
[Â¶27.] In fact, it appears that as early as 1986, within a month after the purchase was made, McGill actively investigated the appropriateness of the investment.  By no later than July 1990, not only were the principals aware that the policy could self-destruct, the possibility of a claim against Nordseth for fraud (among other things) was suggested to one of the new policy-owners, Charles Thissell, himself an attorney, and with whom McGill had been communicating.
[Â¶28.] The statute of limitation begins to toll when McGill became aware of facts giving actual or constructive notice to suspect a fraud.  Strassburg v. Citizens State Bank, 1998 SD 72 Â¶10, 581 NW2d 510, 514.   McGill argues that Nordseth knew the policy was underfunded by $49,111 and that he had an affirmative duty to disclose this fact.  If so, the legal inquiry is the same:  when did McGill know enough to suspect he had a case?  Fraudulent concealment tolls the statute of limitations until the claim is disclosed or might have been discovered with reasonable diligence.  Id., at Â¶14, 581 NW2d at 515.  The discovery of the additional $49,111 doesnât alter the original causes of action.  At best it only supports the original theory that the policy was risky and inappropriate.
[Â¶29.] Furthermore, if a confidential relationship is found to exist between Mrs. Thissell and American Life which may require an affirmative duty to disclose the $49,111 underfunding, the statute is only tolled until McGill had sufficient notice of facts to put him on alert that his causes of action existed.  It is clear from the record that by no later than 1990, McGill was in possession of sufficient facts to put him on notice of facts supporting the causes of action that the policy was oversold, was interest sensitive, could self-destruct, was an inappropriate and risky investment, was misrepresented as self-sustaining, and that there existed the potential causes of action which he ultimately pled.  For nearly eight years after possessing those facts, McGill was idle.  There is no genuine issue of material fact that he was in possession of sufficient facts to put him on actual or constructive notice to suspect fraud or any other cause of action asserted in his complaint. 

[1].         This initial premium represented approximately one-half of Berniceâs net worth and well over half of her liquid assets.
 

[2].         These policies were extremely popular during the early 1980âs when interest rates were in double digits.  As interest rates fell, so did the popularity of these policies. 

[3].         Berniceâs sons, James, Charles and David are the beneficiaries of the policy and defendants in this action pursuant to SDCL 15-6-19(a) (persons to be joined if feasible).
 

[4].         Relevant portions of the letter are quoted herein:
                        The death benefit in this policy originally was $200,000.00. . . .  On June 20, 1988 the death benefit was reduced to $190,000.00.  The reason for this was because interest rates had decreased and the mortality charge on the premium was too high.
 . . .  
My two concerns on the policy, and Mr. Nordseth is free to comment on these in any letter that he has in response to this letter, [are] what is the interest payable on the policy and whether it is possible to convert this policy to paid-up coverage in a certain face amount so that there would be no further mortality charge or premiums due on the policy.  If it is possible to convert it to paid-up, my next question would be what would [be] the paid-up value in death benefit on that policy?  If it were converted to paid up insurance, there would be no risk in the mortality charge consuming the principal.
 

[5].         This also becomes an issue of fact as the complaint charges that Bernice was incompetent in July of 1990 when she executed the assignment of the policy. As previously noted in the same year she could not be relied upon to recognize the significance of her own mail. 

[6].         American Life also argues that because Bernice assigned the policy to her sons in 1990, she is not the proper party to bring the present lawsuit.  We find this argument to be without merit.