2002 SD 156

Ann PURDY, natural mother of the Deceased, in her personal capacity and as Administrator of the Estate of Amanda Froistad, Deceased, Plaintiff and Appellant,

v.

Lisa FLEMING, in her personal and representative capacities; Wendy Cummings, in her personal and representative capacities; and Dr. Frank Buzzetta, (Deceased), Defendants and Appellees.

No. 22181.

Supreme Court of South Dakota.

Argued Oct. 8, 2002.

Decided Dec. 11, 2002.

Alicia D. Garcia, Michael Abourezk of Abourezk Law Firm, P.C., Rapid City, South Dakota, Attorneys for plaintiff and appellant.

. Neil Fulton of May, Adam, Gerdes & Thompson, LLP, Pierre, South Dakota, Attorney for defendants and appellees Fleming and Cummings.

Catherine M. Sabers, Thomas G. Fritz of Lynn, Jackson, Shultz & Lebrun, Rapid City, South Dakota, Attorneys for defendant and appellee Buzzetta.

GILBERTSON, Chief Justice.

[¶ 1.] Ann Purdy (Purdy), as administrator of the Estate of Amanda Froistad, and as the natural mother of the deceased, brought actions against several defendants relating to the investigation of the abuse and the resultant death of her daughter. The defendants, Dr. Frank Buzzetta (deceased), and Department of Social Service employees, Lisa Fleming and Wendy Cummings, moved for summary judgment, which the trial court granted. Purdy brings this appeal asking us to review the trial court's order. We affirm.

**FACTS AND PROCEDURE**

[¶ 2.] Amanda Marie Froistad (Amanda) was born on August 4, 1989. Tragically, when she was five years old, she died in a house fire in Bowman, North Dakota. At the time of Amanda's death, she was living with her father, Larry Froistad (Froistad) who had physical custody of her. Initially, the police determined the fire to be accidental. However, three years later, Froistad confessed in an Internet chatroom that he had murdered his daughter. Several members of the chat group reported this information to law enforcement officials. After a criminal investigation, it was revealed he had been sexually abusing Amanda for years before her murder.[1] Subsequently, Froistad pled guilty to North Dakota State charges of Class AA Murder and federal charges of sexual exploitation of a minor.[2]

[¶ 3.] The criminal investigation also revealed that social service agencies in both South Dakota and North Dakota had received reports of the abuse of Amanda. These reports were made in July of 1994 at the time Purdy, Amanda's mother, had custody of her daughter in South Dakota. During this period, Amanda's parents shared custody of Amanda, with Froistad having custody during the school year and Purdy having custody during the summer.

[¶ 4.] After Amanda's day care provider told Purdy that she should seek professional counseling for Amanda because of Amanda's aggressive behavior, Purdy brought Amanda to Liz Thorn, M.A., a psychologist. During the course of this initial interview, Amanda revealed to Thorn that her dad had been touching her genital area with his hands and with "his a stick" [sic]. As a result of these disclosures, Thorn referred Amanda to the South Dakota Department of Social Services.

[¶ 5.] On approximately July 13, 1994, Wendy Cummings (Cummings), a Department of Social Service supervisor, assigned Amanda's case to Lisa Fleming (Fleming). After interviewing Amanda, Fleming relayed to Purdy the information she received from Amanda. The details of this conversation between Fleming and Purdy are disputed. Purdy claims Fleming told her that Amanda did not repeat her allegations of sexual abuse and that she sounded like "an angry child." However, Fleming testified that Amanda indicated possible sexual abuse but did not provide confirming details. Whatever the case, Fleming

---

1. As part of its investigation, North Dakota law enforcement authorities discovered pornographic videos on the hard drive of Froistad's computer allegedly depicting sexual encounters between Froistad and his daughter, Amanda.

2. Froistad was sentenced to 40 years, with ten years suspended, in prison at the North Dakota Department of Corrections.

and Cummings believed that South Dakota lacked jurisdiction for any abuse and neglect or criminal action, because it was their belief that the alleged abuse occurred in North Dakota when Froistad had legal and physical custody of Amanda. They, therefore, referred the information obtained in the interview to North Dakota Social Services. The Department of Social Services in North Dakota believed South Dakota had jurisdiction of this matter because Amanda was visiting in this state with her mother at the time of the referral.

[¶ 6.] Because of Amanda's allegations against her father, Purdy moved to have the custody arrangement modified in North Dakota. Froistad hired Dr. Frank Buzzetta, a licensed psychologist, to present a custody report. The North Dakota court ordered that the entire family be seen by Dr. Buzzetta prior to the court's rendering a decision on Purdy's petition for a change in custody. Dr. Buzzetta's final recommendation to the North Dakota custody court indicated that he believed that the sexual abuse allegations against Froistad were false. Ultimately, Purdy's motion to change the custody of Amanda was denied and custody remained as it had originally been set, with Purdy having custody of Amanda only during the summer months.

[¶ 7.] After Amanda's death and Froistad's confession in the Internet chatroom, Purdy filed claims against Fleming and Cummings, under state wrongful death and survival causes of actions.[3] Purdy also brought claims against Cummings alone for negligent hiring, training, and supervision. She additionally presented a claim that Amanda's substantive due process right of bodily integrity under the Fourteenth Amendment was violated.

[¶ 8.] Furthermore, Purdy brought claims against Dr. Buzzetta because he was the author of the report to the North Dakota court recommending that custody should remain unchanged. Purdy's claim against this Defendant alleged a cause of action for wrongful death, claiming Dr. Buzzetta had breached various duties owed to Amanda, including a duty to report suspected abuse.

[¶ 9.] All three of the defendants moved for summary judgment, which the trial court granted. The trial court found that the claims against Dr. Buzzetta were barred based upon the statute of limitations and good faith immunity. Summary judgment for the state claims was granted in Fleming and Cummings' favor based on Purdy's failure to give notice within 180 days of injury. Additionally, the trial court granted summary judgment on the federal claim because of qualified immunity.

[¶ 10.] Purdy appeals the grant of summary judgment in favor of the South Dakota Department of Social Services defendants, raising the following issues for appeal:

1. **Whether Purdy failed to comply with the notice requirements of SDCL 3–21–2 and the applicable statute of limitations.**

2. **Whether Fleming and Cummings are entitled to good faith immunity under SDCL 26–8A–14.**

3. **Whether Cummings is entitled to sovereign immunity from Purdy's negligent supervision, hiring, and training claim.**

---

**3.** Although not raised by Purdy on appeal, it appears the statute of limitations for the survival action is not tolled by Amanda's minority because of her death. *See Holt v. Lenko,* 791 A.2d 1212, ¶ 10 (Pa.Super.2002) (concluding that the minority tolling provisions do not contemplate a minor who has died).

4. **Whether Purdy's federal claim under 42 USC § 1983 is barred by qualified immunity.**

Purdy appeals the grant of summary judgment in Dr. Buzzetta's favor, raising the following issues for appeal:

1. **Whether the causes of action against Dr. Buzzetta were barred by the applicable statute of limitations.**

2. **Whether Dr. Buzzetta is entitled to good faith immunity under SDCL 26–8A–14.**

## STANDARD OF REVIEW

[¶ 11.] Summary judgment is authorized "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *Holzer v. Dakota Speedway, Inc.*, 2000 SD 65, ¶ 8, 610 N.W.2d 787, 791–792 (citing SDCL 15–6–56(c)). We will affirm only when there are no genuine issues of material fact and the legal questions have been correctly decided. *Id.* (citing *Bego v. Gordon*, 407 N.W.2d 801, 804 (S.D.1987)). All reasonable inferences drawn from the facts must be viewed in favor of the non-moving party. *Id.* (citing *Morgan v. Baldwin*, 450 N.W.2d 783, 785 (S.D.1990)). The burden is on the moving party to clearly show an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law. *Id.* (citing *Wilson v. Great N. Ry. Co.*, 83 S.D. 207, 212, 157 N.W.2d 19, 21 (1968)). "Summary judgment will be affirmed if there exists *any* basis which would support the trial court's ruling." *Id.* (citing *Wolff v. SD Game, Fish and Parks Dept.*, 1996 SD 23, ¶ 32, 544 N.W.2d 531, 537 (citing *St. Paul Fire & Marine Ins. v. Schilling*, 520 N.W.2d 884, 886 (S.D.1994)) (emphasis added).

[¶ 12.] Our review of the constitutionality of a statute is *de novo*. *Green v. Siegel, Barnett & Schutz*, 1996 SD 146, ¶ 7, 557 N.W.2d 396, 398 (citing *Kyllo v. Panzer*, 535 N.W.2d 896, 897 (S.D.1995)).

## ANALYSIS AND DECISION

*Claims against Cummings and Fleming*

[¶ 13.] **1. Whether Purdy failed to comply with the notice requirements of SDCL 3–21–2 and the applicable statute of limitations.**

[¶ 14.] Purdy's state law claims included actions for wrongful death, claims in the nature of survival actions, claims for negligence, claims for gross negligence, and claims for negligent hiring, training, and supervision. Cummings and Fleming argue that Purdy did not meet the notice requirements provided for under SDCL 3–21–2. Specifically, this statute provides:

> No action for the recovery of damages for personal injury, property damage, error or omission or death caused by a public entity or its employees may be maintained against the public entity or its employees unless written notice of the time, place and cause of the injury is given to the public entity as provided by this chapter within *one hundred eighty days* after the injury.

(emphasis added). Purdy concedes that she had not substantially complied with the notice requirement until August of 1998, a date more than three years after Amanda's death, which occurred on or about May 31, 1995. However, Purdy contends that the date of discovery should trigger the 180–day notice period. For this proposition, she cites to *Myears v. Charles Mix County*, 1997 SD 89, 566 N.W.2d 470. However, that case dealt with substantial compliance with the con-

tent requirement of SDCL 3–21–2, not the time requirement. *Myears,* 1997 SD 89, ¶¶ 10–12, 566 N.W.2d at 472–73. When the time requirement of this statute has been in dispute, we have continuously held that the date of the injury is the triggering event for the 180–day period. The statute clearly says, "after the injury," not "after discovery of the injury." *See, e.g., Peterson ex rel Peterson v. Burns,* 2001 SD 126, ¶ 39, 635 N.W.2d 556, 570 (stating that SDCL 3–21–2 is an example of a notice statute in which a plaintiff must give 180 days notice after the time of the injury); *Holland v. City of Geddes,* 2000 SD 71, ¶ 10, 610 N.W.2d 816, 819 (holding that the 180–day period runs from the completion of the continuing injury); *Brishky v. State,* 479 N.W.2d 489, 493 (S.D.1991) (stating that "notice of the claim must be given to the Attorney General and to the public entity within 180 days after the injury"). We therefore hold that the date of injury was the triggering event that set SDCL 3–21–2's 180–day time period in motion.

[¶ 15.] Alternatively, Purdy argues that the statute of limitations and statutory notice period were tolled by fraudulent concealment. While she concedes that there is no case law in South Dakota which serves to toll the 180–day notice period of SDCL 3–21–2, she urges us to extend the doctrine of fraudulent concealment to toll this notice of claim provision. Additionally, Purdy argues that there are material facts in dispute that precluded the trial court from ruling that as a matter of law fraudulent concealment did not apply to this case. Purdy charges that there were facts presented from which reasonable people could conclude that Cummings and Fleming fraudulently

concealed critical information from Purdy concerning their investigation of the sexual abuse of Amanda. For example, Purdy claims that Fleming told her that Amanda had not discussed with Fleming Froistad's touching of Amanda on her private parts, although Fleming's report stated that Amanda did specifically tell Fleming of the touching.[4]

[¶ 16.] Purdy claims that there is an additional material issue in dispute. During her deposition, Fleming claims she told Purdy that she would "forward [the information] to North Dakota for their investigation, if they were going to do that, for them to determine whether or not they were going to do an investigation, because we have no control over that." On the other hand, Purdy states that Fleming did not tell her that South Dakota Department of Social Services was not responsible for the investigation. Purdy claims that it was her understanding that South Dakota would be coordinating the investigation with North Dakota and that each agency would take appropriate responsibility for its part of the investigation. Purdy further alleges that Fleming did not contact North Dakota to communicate the report of sexual abuse until sometime in September of 1994.

[¶ 17.] Fleming and Cumming's reply to Purdy's argument is that there is no evidence they acted to hide any information not already known or readily discoverable by Purdy. They allege that since Purdy was aware of the underlying facts of her cause of action, she cannot claim fraudulent concealment. Purdy was privy to all the information in the North Dakota custody proceeding, including Fleming's report. Furthermore, Fleming and Cum-

---

4. Further, in Fleming's typed interview of Amanda for the State of North Dakota, she wrote that "Amanda then went on to state that she was afraid of her dad ... Amanda went on to state that her dad touches her in the privates when she is sleeping with him ... Amanda pointed to her vaginal area."

mings charge that Purdy has not produced anything beyond the bare allegations that someone "lied"; nor has she shown that she took any reasonable steps to discover her cause of action.

■■■ [¶ 18.] We have previously held that fraudulent concealment may toll the statute of limitations. *See Conway v. Conway*, 487 N.W.2d 21, 23 (S.D.1992). We find that this doctrine may be extended to a notice of claim provision. In applying this doctrine to a particular set of facts, we first must determine whether a fiduciary relationship existed between the parties. Although it appears that in this appeal Purdy does not allege such a relationship existed, we nonetheless chose to address this issue. "The existence of a fiduciary duty and the scope of that duty are questions of law for the court." *High Plains Genetics Research, Inc. v. J.K. Mill–Iron Ranch*, 535 N.W.2d 839, 842 (S.D.1995). Generally, in such a relationship, the "property, interest or authority of the other is placed in the charge of the fiduciary." *Id.* (additional citations omitted). In *Garrett v. BankWest, Inc.,* we found that a "fiduciary relationship imparts a position of peculiar confidence placed by one individual in another." 459 N.W.2d 833, 837 (S.D.1990). Normally, in a fiduciary relationship, one of the parties has a superior power over the other. *Id.*

■■■ [¶ 19.] Such a relationship was not present here. The Department of Social Services investigates hundreds, if not thousands, of cases of child abuse each year. Much of the information it receives is given to other people and agencies in the course of its investigation; thus, Purdy

knew that the information she gave to Fleming was not going to be kept confidential. Fleming and Cummings' primary relationship was not with Purdy. Its primary relationship is with the state in carrying out its goals. Furthermore, the Department of Social Services did not have control over the custody of Amanda. At that time the question of legal custody continued to rest with the court in North Dakota. Amanda was actually living with her mother, not under the supervision of the Department of Social Services. We, therefore, find that a fiduciary relationship did not exist between Purdy and the Department of Social Service workers.

■■■ [¶ 20.] In the absence of a fiduciary relationship, fraudulent concealment does not exist simply because a cause of action remains undiscovered, but only when the defendant affirmatively prevents discovery.[5] *Bruske v. Hille*, 1997 SD 108, ¶ 19, 567 N.W.2d 872, 879 (stating "in the absence of some trust or confidential relationship between the parties there must be some affirmative act or conduct on the part of the defendant designed to prevent, and which does prevent, the discovery of the cause of action."). A limitations period is not tolled if the plaintiff knew the facts underlying the cause of action or failed to exercise due diligence to discover them. *Strassburg v. Citizens State Bank*, 1998 SD 72, ¶ 13, 581 N.W.2d 510, 515; *Glad v. Gunderson*, 378 N.W.2d 680, 682–83 (S.D. 1985). Furthermore, we have previously stated:

> In summary judgment proceedings, where the defendant asserts the statute of limitations as a bar to the action, and

---

**5.** Because we hold that a fiduciary relationship was not present, cases such as the *City of Aberdeen v. Rich* are distinguishable from the present case. 2001 SD 55, 625 N.W.2d 582. In *Rich,* we found that a fiduciary relationship existed and in such, mere silence or lack

of disclosure constituted fraud. 2001 SD 55, ¶ 21, 625 N.W.2d at 587. Moreover, that affirmative steps are needed to constitute fraudulent concealment applies equally to the claims against Dr. Buzzetta, discussed below.

presumptively establishes the defense by showing the case was instituted beyond the statutory period, the burden then shifts to the plaintiff to establish the existence of material facts in avoidance of the statute of limitations, e.g., fraudulent concealment of the course of action.

*Conway*, 487 N.W.2d at 23 (citing *Kurylas, Inc. v. Bradsky*, 452 N.W.2d 111, 117 (S.D. 1990) (additional citations omitted)). Therefore, the burden is on Purdy to demonstrate that material facts are present to support fraudulent concealment.

[¶ 21.] We find that Purdy cannot meet this burden. There is no evidence that Cummings or Fleming acted to hide any information not already known or readily discoverable by Purdy. *See Strassburg*, 1998 SD 72, ¶ 15, 581 N.W.2d at 515. She was told South Dakota was not going to investigate further and was going to refer the matter to North Dakota, where Froistad lived. Additionally, Purdy was privy to all the information presented in the North Dakota custody proceeding. She was actually there while Cummings and Fleming were not. She told the judge about Amanda's allegations against Froistad and the judge also was provided with Liz Thorn's report in which Thorn substantiates the allegations.[6] Although Purdy claims that she believed that someone had "twisted the facts" about Froistad's potential danger to Amanda, she did not take action until long after the statute of limitations had expired. Since she was at least as aware as Cummings and Fleming of the underlying facts of her cause. of action, Purdy cannot claim fraudulent concealment. As a result, the statute of limitations and notice period of SDCL 3–21–2 were not tolled, and the Circuit Court properly awarded Fleming and Cummings summary judgment.

[¶ 22.] **2. Whether Fleming and Cummings are entitled to good faith immunity under SDCL 26–8A–14.**

[¶ 23.] Although, it appears Purdy's causes of action against Cummings and Fleming were properly dismissed under the issue above, she argues that such a conclusion is not final as to preclude examination of her claim under this issue. Although this argument would seem to be incorrect, we nonetheless address Purdy's "good faith" argument on the merits.

[¶ 24.] Cummings and Fleming argue that they are afforded "good faith immunity" for acts and/or omissions under SDCL 26–8A–14. This statute provides in pertinent:

> Any person or party participating in *good faith* in the making of a report ... pursuant to §§ 26–8A–3 to 26–8A–8, inclusive, or pursuant to any other provisions of this chapter, is immune from any liability, civil or criminal, that might otherwise be incurred or imposed, and has the same immunity for participation

---

6. That written report to the North Dakota judge by Liz Thorn contained a graphic description of Thorn's interviews with Amanda:
> In meeting with Amanda in this first session she stated to me that her daddy touched her on her private parts with his hands. I reported this to Social Services and an investigation was to have been done in North Dakota. Continuing counseling sessions were on a weekly basis. Throughout these sessions Amanda would state to me that she missed her daddy but wants to just visit him, wanted to live with her mother. This was a repeated theme. When I would ask her why she would state to me "Because he touches me on my private parts." Again, on 7–26–94, our third session together, Amanda spoke with me about the fact that her daddy touched her on her private parts and she wished with my wishing wand that I could teach daddy not to touch her on her private places.

in any judicial proceeding resulting from the report. Immunity also extends in the same manner ... to child protection teams established by the secretary of social services, to public officials or employees involved in the investigation and treatment of child abuse or neglect.

(emphasis added). We have defined "good faith" as used in this statute as "performing honestly, with proper motive, even if negligently." *Cotton v. Stange,* 1998 SD 81, ¶ 8, 582 N.W.2d 25, 28 (citing *B.W. v. Meade County,* 534 N.W.2d 595, 596 (S.D. 1995). Further, the "standard for determining good faith is a defendant's honest belief in the suitability of the actions taken." *Id.*

[¶ 25.] Purdy argues there are genuine factual issues in dispute as to whether Cummings and Fleming acted in good faith. Specifically, she charges that even if Cummings and Fleming had the mistaken belief that they could not act to protect Amanda because they lacked jurisdiction, they later learned that North Dakota was not going to conduct an investigation either, and they still did not conduct any further investigation. Based on the following analysis, we hold that although these alleged actions may be arguably negligent, their conduct cannot be said to be taken in bad faith.

[¶ 26.] We have held that there must be some evidence that defendants acted with an improper purpose in their failure to take further investigatory steps. *B.W.,* 534 N.W.2d at 597–98; *Cotton,* 1998 SD 81, ¶¶8–12, 582 N.W.2d at 28–29. We have also held that erroneous interpretation of jurisdictional laws has also been held to be protected by SDCL 26–8A–14. *Brown Eyes v. Department of Social Services,* 2001 SD 81, ¶ 15, 630 N.W.2d 501, 507.

[B]ad faith ... is obviously something far more extreme than a failure to ob-serve reasonable ... standards or the standards of a reasonably prudent [person]. It is irrelevant that the person in question was negligent informing a particular belief. All that is required ... is the actual belief or satisfaction of the criterion of the "pure heart and empty head."

*Cotton,* 1998 SD 81, ¶ 11, 582 N.W.2d at 29 (citing *Garvis v. Scholten,* 492 N.W.2d 402, 404 (Iowa, 1992)). While the actions of Cummings and Fleming are very arguably negligent, they fall well short of the bad faith standard. As such, after a review of the record in the light most favorable to Purdy, there is no evidence that Cummings and Fleming acted for an improper purpose and thus, summary judgment based on SDCL 26–8A–14 is proper.

[¶ 27.] Purdy contends that to the extent SDCL 26–8A–14 seeks to immunize the ministerial acts of public employees, it is unconstitutional. For support, Purdy cites to South Dakota Const. Article VI, Section 12 (prohibiting the passage of immunity laws); Article VI, Section 18 (privileges and immunities clause); Article III, Section 23(9) (prohibiting the legislature from passing special laws granting immunity to individuals, associations, or corporations). Moreover, Purdy contends that this attempt to grant immunity to actions of Department of Social Services employees violates Article VI, Section 20, the "open courts" provision, of the South Dakota Constitution.

[¶ 28.] In analyzing the constitutionality of a statute that limits liability, we have consistently held:

Where the constitutional validity of a statute depends upon the existence of facts, courts must be cautious about reaching a conclusion respecting them contrary to that reached by the legislature; and if the question of what the

facts establish be fairly debatable one, it is not permissible for the judge to set up his opinion in respect of it against the opinion of the lawmaker.

*Vilhauer v. Horsemen's Sports, Inc.,* 1999 SD 93, ¶ 11, 598 N.W.2d 525, 527 (additional citations omitted). Additionally, when the issue of good faith immunity under SDCL 26–8A–14 has been before this Court, we have upheld this statute. *See, e.g., Brown Eyes,* 2001 SD 81, ¶ 16, 630 N.W.2d at 508 (holding summary judgment was proper because of good faith immunity under SDCL 26–8A–14); *Cotton,* 1998 SD 81, ¶ 13, 582 N.W.2d at 29 (finding Department of Social Services employee's conduct fell under immunity provided by SDCL 26–8A–14); *B.W.,* 534 N.W.2d at 597 (stating that public officials and employees involved in the investigation and treatment of child abuse and neglect are covered by our immunity statute). In line with our previous holdings, we find SDCL 26–8A–14 constitutional, and therefore, Cummings and Fleming's actions are shielded under this statute's immunity.

[¶ 29.] Because we find that both Cummings and Fleming are immune from suit under SDCL 26–8A–14, there is no need to address the issue of sovereign immunity as it relates to Cummings.

[¶ 30.] **3. Whether Purdy's federal claim under 42 USC § 1983 is barred by qualified immunity.**

[¶ 31.] Pursuant to 42 USC § 1983, Purdy claims that Amanda's Fourteenth Amendment substantive due process right to be free from bodily harm caused by third parties has been violated. For support, she cites to *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). While Purdy acknowledges that the general rule of *DeShaney* is that state actors generally have no due process obligation to protect private parties from other private parties, she argues that *DeShaney's* holding was limited to violations of a *discretionary* duty. In contrast, Purdy alleges that *ministerial* duties in the instant case were violated.

[¶ 32.] We find this argument unpersuasive. Even assuming the jurisdictional obligation to investigate fell upon Cummings and Fleming, rather than North Dakota Social Services, the numerous ins and outs of such an investigation are clearly a discretionary duty as to how the investigation is done. Who to talk to, what type of information to seek, the possible use of various types of experts, determinations of witness credibility and recommendations to appropriate prosecuting and other legal authorities all call for discretion by the investigator. It is very similar to the discretion exercised by law enforcement conducting criminal investigations. It is a far cry from a Social Worker deciding whether or not to stop for an oncoming car (*Kyllo v. Panzer,* 535 N.W.2d 896 (S.D.1995)) or placing a child in foster care under predetermined criteria and standards (*Brown Eyes,* 2001 SD 81, ¶ 12, 630 N.W.2d at 506).

[¶ 33.] Purdy alleges that Fleming and Cummings violated Amanda's substantive due process right to bodily integrity by failing to investigate her claims of sexual abuse against Froistad. However, under *DeShaney,* no due process violation occurs when state actors simply fail to protect individuals from harm by private actors. 489 U.S. at 195, 109 S.Ct. at 1003, 103 L.Ed.2d at 258–59. The facts of the instant case are not materially distinguishable from the facts of *DeShaney.* In *DeShaney,* after multiple allegations of abuse by his father to social workers, Joshua DeShaney was returned to his father's home and subsequently, suffered severe brain damage. *DeShaney,* 489 U.S. at 193,

109 S.Ct. at 1001–02, 103 L.Ed.2d at 257. The United States Supreme Court held that the allegations against social workers that they failed to protect the child from his father does not constitute a violation of a recognized constitutional right. *Id.* at 201, 109 S.Ct. at 1007, 103 L.Ed.2d at 262–63. Therefore, Purdy's allegations must also fail under this holding.

[¶ 34.] Although *DeShaney* contains two exceptions to this general rule, we find that neither exception applies to the case at hand. First of all, Cummings and Fleming did not have a special or fiduciary relationship with Amanda because she was not in the state's custody. *Id.* at 198–199, 109 S.Ct. at 1004–05, 103 L.Ed.2d at 260–61. Depending on the time of the year, Amanda was in her father's custody or her mother's custody. Second, Amanda was not injured by a state created danger. *Id.* at 201, 109 S.Ct. at 1006, 103 L.Ed.2d at 262–63. Here, Cummings and Fleming did not create the danger that ultimately caused Amanda's death. Just as returning Joshua DeShaney to his father did not constitute a state created danger; failing to remove Amanda from Froistad's home in North Dakota did not either. We hold that there is no genuine issue of material fact as to Purdy's federal claim and thus, summary judgment was proper.

*Claims against Dr. Buzzetta*

[¶ 35.] 4. **Whether the causes of action against Dr. Buzzetta were barred by the applicable statute of limitations.**

■■■ [¶ 36.] Purdy alleged several claims against Dr. Buzzetta, including a claim for wrongful death. SDCL 21–5–3 sets forth the statute of limitations for wrongful death in South Dakota. This statute states that "[e]very action for wrongful death shall be commenced within three years after ... death." Even though Purdy admits this cause of action was not commenced until nearly four years after Amanda's death, she claims that fraudulent concealment prevented her from discovering the existence of her cause of action. Purdy argues that she had a confidential relationship with Dr. Buzzetta and accordingly, claims that where "a trust or confidential relationship does exist between the parties, silence on the part of one having the duty to disclose, constitutes fraudulent concealment ..." *See Hinkle v. Hargens*, 76 S.D. 520, 525, 81 N.W.2d 888, 891 (1957) (recognizing a trust relationship in a doctor/patient relationship).

■■■ [¶ 37.] Although in normal circumstances, a confidential relationship does exist between a psychologist and his patient, this is not the case here. Purdy did not approach Dr. Buzzetta voluntarily seeking treatment. Dr. Buzzetta's examination was part and parcel of a court proceeding Purdy initiated. By Purdy's own testimony, she knew that the information obtained during her interview with Dr. Buzzetta would not be kept confidential and would be provided to Froistad and the court pursuant to its order. The order was the sole basis for their relationship and it clearly did not contemplate setting up a confidential relationship between Purdy and Buzzetta. In light of the limited purpose of this examination by Buzzetta, Purdy's visit with him and the public nature of the attendant court proceedings, this should not be considered a relationship of voluntary patient/psychologist with the corresponding expectation of trust and confidence. *See* SDCL 19–13–6(4) (providing that a communication is confidential if not intended to be disclosed to a third person). Therefore, Purdy's argument fails.

■■■ [¶ 38.] Purdy claims that Dr. Buzzetta purposely omitted certain facts about Froistad in his report, such as a past suicide attempt and a possible history of

childhood sexual abuse. Even if Purdy's claims are true, she received a copy of Dr. Buzzetta's report in December of 1994 or soon thereafter. She testified that at this time, she disagreed with the report and felt Dr. Buzzetta had "twisted" the information given to him in Froistad's favor in order to paint her in an unfavorable light. For example, Purdy testified that although she had told Dr. Buzzetta about Froistad having been sexually abused as a child, the report makes no mention of such. However, Purdy took no action to determine if any other omissions existed, and she never contacted Dr. Buzzetta to discuss the report. Furthermore, she did not object to its use in the North Dakota court proceedings. Purdy's decision not to inquire as to whether any other information, which she deemed relevant, was omitted from Dr. Buzzetta's report precludes her claim as a matter of law. *See Strassburg*, 1998 SD 72, ¶ 7, 581 N.W.2d at 513 (holding that when one receives documents that puts this person on notice of fraud, the fraud is discoverable as a matter of law for limitations period purposes). Purdy can also provide no evidence that Buzzetta took any affirmative steps to prevent her from discovering her cause of action. *See Bruske*, 1997 SD 108, ¶ 20, 567 N.W.2d at 880 (stating that to establish fraudulent concealment, the actions, or inactions, of the defendant must be directed to the point of obtaining delay). Consequently, there are no genuine issues that exist with regard to fraudulent concealment. We, therefore, find that Purdy's claims against Dr. Buzzetta were properly dismissed.

## CONCLUSION

[¶ 39.] It takes a strong judicial stomach to set aside one's emotions concerning the unspeakable acts inflicted upon Amanda and impartially review them as against the applicable law. The ultimate villain is in a North Dakota prison where he clearly belongs for a long time. Viewing the conduct of the defendants, especially with the benefit of hindsight, it hardly constitutes a textbook perfect case about how to investigate, and deal with, allegations of sexual abuse upon children. The fate of Amanda will hopefully serve as a wake-up call that increased vigilance is needed to avoid a tragic repetition of this type of case. Nevertheless the facts do not create the basis for a trial for damages against the defendants for the reasons set forth above.

[¶ 40.] Affirmed.

[¶ 41.] ZINTER, Justice, and AMUNDSON and MILLER, Retired Justices, concur.

[¶ 42.] MARTIN, Retired Circuit Court Judge, sitting by Order of the Court, concurs in part and dissents in part.

[¶ 43.] MILLER, Retired Justice, sitting for SABERS, Justice, disqualified.

[¶ 44.] MARTIN, Retired Circuit Court Judge, sitting for KONENKAMP, Justice, disqualified.

[¶ 45.] MEIERHENRY, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

MARTIN, Retired Circuit Judge (concurring in part and dissenting in part)

[¶ 46.] I concur with the majority opinion regarding the claims against Fleming and Cummings.

[¶ 47.] I dissent regarding the claims against Dr. Buzzetta.

*Claims against Dr. Buzzetta*

[¶ 48.] Dr. Buzzetta was a licensed psychologist. He was hired by Larry Froistad in the North Dakota custody dispute to conduct an evaluation to respond to the allegations of Purdy and the information

she offered from child therapist Liz Thorn, the counselor that was providing services to Amanda. The circuit judge in North Dakota ordered Dr. Buzzetta to also evaluate Purdy and the child Amanda. Dr. Buzzetta requested Richard Leir, counselor, to make some initial evaluations of the parents and the child. Leir did *not* interview the child. Leir sent his report to Dr. Buzzetta with certain reservations and did not intend his conclusions to be the final recommendation to the court. Dr. Buzzetta submitted his report to the North Dakota circuit judge, with the following perceived deficiencies:

1. There was a note in Dr. Buzzetta's file indicating that Dr. Buzzetta deleted certain "Larry Facts" from the Leir report. Those facts include Larry's suicide attempts and his sexual history (possible childhood sexual abuse) detailed in the Leir report.

2. Despite his failure to include Larry's suicide attempts, Dr. Buzzetta reported Purdy's suicide attempts. This shows his lack of impartiality.

3. Dr. Buzzetta retained that portion of the Leir report concerning sexually transmitted diseases, and recommended to the North Dakota court that all children (four) be tested for sexually transmitted disease. Despite concluding that Larry Froistad was not abusing the children.

4. Dr. Buzzetta knew that the Leir report was not comprehensive in nature.

5. Dr. Buzzetta's report states that he interviewed the child. However, Dr. Buzzetta's report contains nothing about Amanda. The report contains a summary of the findings regarding the parents and the following statement, "obviously this evaluation is based on self-report from Larry and Ann in addition to some very limited information from Ms. Liz Thorn, Ann's Counselor. . . ."

The report seems to conflict as to whether he did or did not interview the child.

6. Dr. Buzzetta was ordered by the court to evaluate Amanda. If he did interview the child, where is the evaluation?

7. Dr. Buzzetta's report (page one) specifically states: "*The information* provided to me by Mr. Leir is included in this report." .Obviously, this is untrue by virtue of Dr. Buzzetta's deletion of certain "Larry Facts."

[¶ 49.] Purdy alleges a claim for the wrongful death of her daughter, Amanda. SDCL 21–5–3 provides a three-year statute of limitation after the wrongful death. Fraudulent concealment tolls a statute of limitation until the cause of action is discovered, or might have been discovered by exercise of diligence.

> In the absence of some trust or confidential relationship between the parties there must be some affirmative act or conduct on the part of the defendant designed to prevent, and which does prevent, the discovery of the cause of action. . . . When, however, a trust or other confidential relationship does exist between the parties, silence on the part of one having the duty to disclose constitutes fraudulent concealment in the absence of any affirmative act.

*Hinkle v. Hargens*, 76 S.D. 520, 525, 81 N.W.2d 888, 891 (1957); *Glad v. Gunderson*, 378 N.W.2d 680, 682 (S.D.1985).

[¶ 50.] The majority opinion states that Purdy did not have the prerequisite "trust or confidential relationship" between herself and Dr. Buzzetta. Thus, Dr. Buzzetta did not have a duty to disclose and therefore his silence could not constitute fraudulent concealment. I disagree.

[¶ 51.] This Court has previously held that whether fraudulent concealment has

occurred is a question of fact. *McGill v. American Life and Casualty Ins. Co.*, 2000 SD 153, 619 N.W.2d 874. There is a jury question as to the existence of fraudulent concealment by virtue of the following:

1. There existed a "trust or confidential" relationship between Purdy and Dr. Buzzetta, imposing a duty to disclose on Dr. Buzzetta.

2. Dr. Buzzetta had an obligation of honesty, impartiality, fairness, and candor to the parties and the court, imposing a duty to disclose on Dr. Buzzetta.

Even if the above "relationships" are unpersuasive, then there is still a jury question as to the existence of fraudulent concealment, by virtue of Dr. Buzzetta's professional code of conduct, and his affirmative acts.

3. Dr. Buzzetta was bound by his professional ethical code of conduct providing for a duty of substantial professional contact, a duty to disclose all pertinent information, and an obligation not to use fraud, misrepresentation, or deception in reporting the results of psychological evaluations or services. *See* AASPB Code of Conduct, May 1991, American Association of State Psychology Boards; SDAR 20:60:07:01 (Psychologists Code of Ethics).

4. Dr. Buzzetta's intentional deletion of certain "Larry Facts" was an affirmative act for jury determination as to fraudulent concealment.

### Trust or Confidential Relationship between Dr. Buzzetta and Purdy

[¶ 52.] The circuit court in North Dakota ordered Dr. Buzzetta to also evaluate Purdy and the child, Amanda. In *Hinkle, supra*, our Court held that where there is a "trust *or* confidential relationship" then silence on the part of one having the duty to disclose, constitutes fraudulent conceal-

ment. The majority opinion states that the relationship between Purdy and Dr. Buzzetta was not confidential in nature because it was a court-ordered relationship and not voluntary on Purdy's part. Further, the majority opinion states that Purdy knew that the information obtained during the interview with Dr. Buzzetta would not be kept confidential.

[¶ 53.] A confidential relationship is not restricted to any particular association of persons. It exists whenever there is trust and confidence, regardless of its origin. Such a confidential relationship exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind. *Kase v. French*, 325 N.W.2d 678, 680 (S.D.1982). The mere fact that the information obtained was court-ordered and would be used in a court proceeding does not destroy this confidential relationship. If the majority opinion is correct, then whenever a court-appointed (ordered) expert is named in a custody hearing, the relationship between the expert and his patient will not be confidential. This would allow the expert to commit fraud, misrepresentation, and/or deception with no duty to disclose *all* pertinent and relevant information to the court.

[¶ 54.] If the relationship between Dr. Buzzetta and Purdy is not one of "confidentiality" then it is certainly one of "trust." Notice the phrase "trust or confidential relationship" is in the disjunctive. In Webster's New World Dictionary, Third College Edition, the word "trust" is defined as, "firm belief or confidence in the honesty, integrity, reliability, justice, etc. of another person; faith; reliance." If Dr. Buzzetta performs a psychological evaluation of Purdy there exists some sort of relationship. I believe it includes a relationship of "trust," which denotes fairness, impartiality, honesty, candor, and justice.

It does not mean Dr. Buzzetta can be selective in the information contained in his report, to the detriment of Purdy. Dr. Buzzetta had a duty to disclose. His silence could constitute fraudulent concealment and the merits of the claim should be determined by a jury.

### Dr. Buzzetta's Obligation to the Parties and the Court

[¶ 55.] Because he was ordered by the circuit court in North Dakota to perform a psychological evaluation on the whole family, Dr. Buzzetta could be considered a court appointed expert. As such, Dr. Buzzetta had an obligation of trust, impartiality, candor, and fairness to the parties and the court. By virtue thereof, Dr. Buzzetta had the duty to disclose. His failure to do so could constitute fraudulent concealment and the merits of the claim should be determined by a jury.

[¶ 56.] Pursuant to ND St Rev Rule 706, the court may select its own expert, with the consent of the expert witness. The rule further provides, "*A witness so appointed shall advise the parties of the witness' findings, if any . . . .*" ND St Rev Rule 706. Pursuant thereto, Dr. Buzzetta had a duty to disclose *all* the relevant and pertinent information concerning his evaluations, including the findings of Leir. This obligation extends to both the parties and the court. How else can the parties receive a fair and impartial evaluation? How else is the judge to make an informed and fair determination of custody?

[¶ 57.] Pursuant to ND St Rev Rule 705 the expert may testify in terms of opinion and give reasons therefore without first testifying to the underlying facts, unless the court requires otherwise. ND St Rev Rule 705. Further, the expert may be required to disclose the underlying facts or data on cross-examination. *Id.* At first glance one might think that the court or Purdy had the opportunity to ask for the underlying facts and it was not done. However, we must remember that Dr. Buzzetta intentionally deleted the aforementioned pertinent facts from his report; therefore, these were not underlying facts or data of his report subject to disclosure on cross-examination. In addition, given his lack of disclosure it is unclear if Dr. Buzzetta would have revealed this information during his cross-examination. In any event, this would be for a jury to decide.

[¶ 58.] The aforementioned North Dakota statutes require disclosure of all the expert's findings. The court is also entitled to a full disclosure. 31A AmJur2d, *Expert and Opinion Evidence,* § 10 (2002) provides: "An expert witness appointed by the trial court to obtain disinterested and unbiased testimony, . . . is an *officer of the court* and does not appear as the witness of either party." Recently, this Court dealt with an attorney (officer of the court) and his obligation for full disclosure. *In Re Discipline of Wilka,* 2001 SD 148, 638 N.W.2d 245. The Court recognized:

> Clearly the requirement of candor towards the tribunal goes beyond simply telling *a portion of the truth.* It requires every attorney to be fully honest and forthright. We cannot over emphasize the importance of attorneys in the State being absolutely fair with the Court. Every court has the right to rely upon an attorney to assist it in ascertaining the truth of the case before it.

*Id.* ¶ 15. Does the obligation and duty of Dr. Buzzetta, under these circumstances, allow him to be selective in what he informs the court, to conceal relevant and pertinent information, to be partial, to fail to follow the court's order, to mislead the court, and to violate his own professional code of conduct? Certainly not. Dr. Buzzetta's duty and obligation was to be fair and impartial with all those evaluated and

to disclose all information relevant and pertinent to a custody hearing so the parties could receive fair and impartial consideration and also assist the court in ascertaining the truth. This requirement allows the judge to make an intelligent, informed, and fair determination of custody.

[¶ 59.] Dr. Buzzetta's obligation to the parties and to the court is an independent foundation for fraudulent concealment irrespective of any question of a "trust or confidential" relationship.

[¶ 60.] Dr. Buzzetta was hired as an expert by Larry Froistad, and ordered by the court to conduct an evaluation as an expert. This is unusual but there are no facts in the record to show its proper perspective. Even if Dr. Buzzetta was some sort of hybrid expert witness, can you question an obligation of full disclosure? Witnesses are sworn to tell the whole truth not suppress the truth. Whether this conduct constituted fraudulent concealment is for a jury to decide.

*Ethical Code of Conduct for Dr. Buzzetta*

[¶ 61.] If we assume that we are absent a "trust or confidential" relationship, Dr. Buzzetta had a duty to disclose, pursuant to his ethical code of conduct. SDAR 20:60:07:01 provides that the code of ethics for licensed psychologists is the AASPB Code of Conduct, May 1991. Pertinent provisions follow:

> III. A. 5 (page 8–9). Sufficient professional information, provides: A psychologist rendering a formal professional opinion about a person, for example about the *fitness of a parent in a custody hearing, shall not do so without direct and substantial professional contact with or a formal assessment of that person.*

> III. H. 3 (page 17). Reservations concerning results, provides: The psychologist *shall include* in his/her report of the results of an assessment proce-

dure any deficiencies of the assessment norms for the individual assessed and any *relevant reservations or qualifications which affect the validity, reliability, or other interpretation of results.*

> III. I. 2 (page 18). Use of fraud, misrepresentation, or deception, provides in part: The psychologist shall not use *fraud, misrepresentation, or deception* ... in providing psychological service, in *reporting the results* of psychological *evaluations* or services, or in conducting any other activity related to the practice of psychology.

[¶ 62.] In *City of Aberdeen v. Rich,* 2001 SD 55, 625 N.W.2d 582, this Court held that fraud and deceit include not only affirmative acts, but also acts of omission. The necessary relationship is satisfied since the professional code of conduct extends to all those Dr. Buzzetta evaluated or treated. Dr. Buzzetta had a duty to disclose.

[¶ 63.] I believe it is a jury question whether Dr. Buzzetta violated the above code of conduct by possibly not interviewing the child; by not providing a report on the child; by not conducting a more comprehensive evaluation of the parents; by providing detrimental information about the mother and not providing similar information about the father; by omitting relevant and pertinent information about the father; and, by stating that his report contained the information provided by Leir.

[¶ 64.] The professional code of conduct is an independent foundation for fraudulent concealment irrespective of any question of a "trust or confidential" relationship.

### Dr. Buzzetta Committed
### an Affirmative Act

[¶ 65.] If we assume that we are absent a "trust or confidential" relationship,

"fraudulent concealment" must consist of some affirmative act or conduct on the part of the defendant designed to prevent, and which does prevent, the discovery of the cause of action. *Strassburg v. Citizens State Bank*, 1998 SD 72, 581 N.W.2d 510. Dr. Buzzetta's failure to disclose pertinent information is identified by his writing, "deleted certain Larry Facts." This was an affirmative act and *continued to be* so. It was also an affirmative step to prevent Purdy from discovering her cause of action. If this constitutes fraudulent concealment is a question for the jury to decide.

[¶ 66.] The majority opinion further states that even if Purdy's contentions are correct she had the necessary documents that put her on notice of the fraud. Therefore, the fraud was discoverable as a matter of law. This purported notice of the discoverable fraud consisted of Purdy having access to Dr. Buzzetta's report, her taking no action to determine if any other omissions existed, and never contacting Dr. Buzzetta to discuss the report.

[¶ 67.] Having a copy of Dr. Buzzetta's report would not show the intentional deletions by Dr. Buzzetta. Requiring Purdy to go to Dr. Buzzetta to discuss the report and presumably ask him if there were any omissions is equally disconcerting. How reasonable is it to expect a lay person to walk into a doctor's office and challenge him regarding his report? Further, if Dr. Buzzetta felt no compunction about deleting certain "Larry Facts" and concealing them from the judge, what makes a reasonable person think Dr. Buzzetta would reveal the fraudulent concealment to Purdy? Her lawsuit was commenced on March 20, 1999. The note in Dr. Buzzetta's file was not discovered until September 1999, pursuant to a motion to order the disclosure. To hold that Purdy knew of the existence of omissions because she had Dr. Buzzetta's report, or that she should have discovered the note earlier, as a matter of law, is untenable. It should be a jury question.

### CONCLUSION

[¶ 68.] It is unfortunate that Dr. Buzzetta is now deceased. He may very well have answers to the aforementioned perceived deficiencies on his part. However, we take the record as it is. In a summary judgment motion, all reasonable inferences drawn from the facts must be viewed in favor of the non-moving party. Viewing the facts in Purdy's favor creates a jury question of fraudulent concealment that would toll the pertinent statute of limitations and allow Purdy to pursue her cause of action for wrongful death.

[¶ 69.] Therefore, I respectfully dissent as to Issue Four.