2004 SD 64

**Tina RAILSBACK, Plaintiff
and Appellant,**

v.

**MID–CENTURY INSURANCE
COMPANY, Defendant
and Appellee.**

No. 22956.

Supreme Court of South Dakota.

Considered on Briefs on March 22, 2004.

Decided May 12, 2004.

Mark E. Salter of Cutler & Donahoe, Sioux Falls, South Dakota, Attorneys for plaintiff and appellant.

Kathryn J. Hoskins of Siegel, Barnett & Schutz, Sioux Falls, South Dakota, Attorneys for defendant and appellee.

SABERS, Justice.

[¶ 1.] Tina Railsback brought suit against Mid–Century Insurance Company alleging fraud, deceit, and misrepresentation. The trial court granted summary judgment in favor of Mid–Century and Railsback appeals. She argues that the trial court erred in holding that 1) the liability insurer did not have a duty to speak truthfully to an injured third-party claimant; and that 2) her claim was a prohibited direct action against an insurer. We reverse both 1 and 2.

### FACTS

[¶ 2.] Early in 1996, Railsback was injured in an automobile accident. She was a passenger in a vehicle driven by Tom Hauglin. Hauglin lost control of the car when he hit a patch of ice. Railsback suffered injuries to her neck and back in the resulting collision. Hauglin was cited for careless driving.

[¶ 3.] Mid–Century was Hauglin's liability insurance carrier. At the time of the accident, Hauglin's policy limit was $50,000.00 per person and $100,000.00 per occurrence. Railsback made a claim against the policy for the injuries she suffered in the accident. She filed the claim and negotiated a settlement with the company without the aid of legal counsel.

[¶ 4.] Diana Austin and Steve Weiler were claims adjusters employed by and acting as agents for Mid–Century. Railsback alleges that Austin and Weiler misrepresented the amount of liability coverage available under Hauglin's policy. She asserts that they led her to believe that the policy limit was $25,000.00 rather than $50,000.00. She claims that they misled her in an effort to induce her to release her claim for $25,000.00.* Specifically, she asserts that the adjusters knew that she was misinformed about the policy limits and that they reinforced that misinformation with ambiguous communications. Entries in the insurer's investigation log by Weiler and Austin indicate that liability coverage was discussed with Railsback. The logs also indicate that the adjusters were aware that Railsback was misinformed. In negotiations, on several occa-

---

* Railsback testified in her deposition that both Weiler and Austin represented to her that Hauglin's policy limit was $25,000.00:

[Mid–Century counsel]: But as we sit here today, are you telling me that Steve Weiler specifically said to you that there was only $25,000 limits of coverage?

Railsback: Yes, I believe that's exactly how it was worded.

. . .

Q: It appears from your testimony that you were advised, not only by Diana Austin, but also by Steve Weiler of an alleged limitation of the policy limits being $25,000. Is that correct?

A: Yes.

sions, Railsback demanded the "policy limits." Austin told Railsback she would not authorize "policy limits" but then offered $20,000.00 in settlement. Railsback ultimately released her claim for $25,000.00 and did not find out until July 2000 that the policy limit was actually $50,000.00. She asserts that had she known the policy limit was greater than $25,000.00 she would not have entered into the settlement. She further asserts that through their written and verbal communications, the adjusters intentionally reinforced her misunderstanding of the policy limits.

[¶ 5.] Railsback brought suit against Mid–Century alleging fraud, deceit and misrepresentation. The trial court granted Mid–Century's motion for summary judgment and Railsback appeals, raising two issues:

1. Whether a liability carrier owes a claimant, who is not their insured, a duty to speak truthfully about the insured's policy limits.

2. Whether the trial court erred in its determination that Railsback's suit was an impermissible direct action against an insurer.

## STANDARD OF REVIEW

[¶ 6.] Our standard of review for summary judgment is well settled. Summary judgment is proper where, the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. SDCL 15–6–56(c).

> We will affirm only when there are no genuine issues of material fact and the legal questions have been correctly decided. [ ] We view all reasonable inferences drawn from the facts in the light most favorable to the non-moving party.

> [ ] In addition, the moving party has the burden of clearly demonstrating an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law.

*Roden v. General Cas. Co. of Wisconsin*, 2003 SD 130, ¶ 5, 671 N.W.2d 622, 624 (internal citations and quotations omitted).

[¶ 7.] **1. WHETHER A LIABILITY CARRIER OWES A CLAIMANT, WHO IS NOT THEIR INSURED, A DUTY TO SPEAK TRUTHFULLY ABOUT THE INSURED'S POLICY LIMITS.**

[¶ 8.] At the hearing on the motion for summary judgment, the trial court held that the insurer had no duty to disclose the policy limits. Railsback argues that this decision "effectively licenses misrepresentations by claims adjusters."

[¶ 9.] The relationship between an insurer and a third party claimant is not a fiduciary or confidential relationship. In fact, we have noted that the insurer stands in the shoes of the insured and therefore, the relationship between the claimant and the insurer is adversarial. *Trouten v. Heritage Mut. Ins. Co.*, 2001 SD 106, ¶ 32, 632 N.W.2d 856, 864. The parties deal at arms length and there is no duty on the part of the insurer to disclose the policy limits during settlement negotiations. Therefore, to the extent the trial court held that there is generally no duty to disclose policy limits, it was correct. However, the question here is narrower. Specifically, whether an insurer may knowingly cause or further a claimants misunderstanding of the policy limits to her detriment.

[¶ 10.] Mid–Century concedes that South Dakota law allows a claimant to affirm a settlement agreement and bring a fraud action against an insurance company without obtaining judgment against the in-

surance company. *See Tucek v. Mueller*, 511 N.W.2d 832, 835–36 (S.D.1994). It argues that 1) it did not have a duty to disclose policy limits or 2) correct Railsbacks mistaken belief and that 3) "the trial court's decision [ ]does not preclude [ ]a direct action against an insurance company where the company actually engages in fraud."

[¶ 11.] The trial court relied on *Smith v. Safeco Ins. Co.*, 112 Wash.App. 645, 50 P.3d 277 (2002) to come to the conclusion that an insurer need only disclose its insured's policy limits if a reasonable person in the same or similar circumstances would believe that the disclosure would be in the insured's best interest. *Id.* at 282. Mid–Century argues that since an insurer has no duty to disclose policy limits, even if the third party is known to have been operating under a mistaken belief, there can be no breach of duty giving rise to a fraud action.

[¶ 12.] We disagree with the trial court's analysis of this issue. In *Tucek*, we overruled a trial court's entry of summary judgment in favor of an insurance company alleged to have defrauded a third-party claimant. In that case, we noted that the claimant was entitled to sue for damages for fraud and deceit. *Tucek*, 511 N.W.2d at 835. We noted more specifically that the claimant could rely on SDCL 20–10–1, 20–10–2(2) and (3), statutes defining deceit, as a basis for her claims. Furthermore, we noted that "questions of fraud and deceit are generally questions of fact and are to be determined, ordinarily, by a jury." *Id.* at 836. We stated, *[e]very participant in a fraud and each one who assists another in the perpetration of the fraud is liable to the injured party. Id.* (Emphasis in the original.) Acknowledging that the "insurer knew it could reach a settlement favorable to itself albeit unfavorable to Tucek," we reiterated that *every* partici-

pant in a fraud is liable to the injured party. *Id.* at 837. We made no distinction between other parties involved in the fraud and the insurance company.

[¶ 13.] In *Maybee v. Jacobs Motor Co., Inc.*, 519 N.W.2d 341, 343 (S.D.1994), we noted:

> An action for deceit requires proof that the misrepresentation was material to the formation of the contract and that the other party relied on the misrepresentation to her detriment. [ ] Such misrepresentations include true statements which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter.

*Id.* (citing Restatement (Second) of Torts 229 (1977) (internal citation omitted)). We have applied the Restatement (Second) of Torts § 551(2). Section 551(2)(b) provides in part that a party to a business transaction has a duty to "exercise reasonable care to disclose to the other before the transaction is consummated":

> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading.

Restatement (Second) of Torts § 551(2)(b) (1977). Assuming all facts in favor of Railsback, there is a genuine issue of material fact whether the insurer deceived or defrauded her or made misrepresentations in the settlement negotiations. Railsback argues that the conversations and letters between her and the adjusters led her to believe, to her detriment, that the policy limits were half of what they actually were. Drawing inferences from the facts in the record in favor of Railsback, it could be reasonably inferred that the adjusters were aware of and exploited her misinformation regarding the policy limits. Furthermore, one could infer that the exploitation amounted to affirmative repre-

sentations of facts they knew were untrue. Mid–Century argues that the claims adjuster's reference to "policy limits" was not ambiguous and that Railsback "attempts to mischaracterize the letter ... sent to [ ]Railsback." These factual assertions merely emphasize the error in the trial court's determination that summary judgment was appropriate. There are questions of material fact whether the claims adjusters' knowledge of Railsback's mistaken belief and manipulation of that belief for the company's benefit amounted to fraud, deceit or misrepresentation.

[¶ 14.] We do not accept the insurer's argument that an insurer never owes a claimant a duty to disclose policy limits just because it is an adversarial relationship. The fact that settlement negotiations are an adversarial process does not diminish the duties of parties to a contract to refrain from material misrepresentation. This issue is reversed and remanded to the trial court for a determination by the fact finder whether the insurer committed fraud or deceit or made material misrepresentations upon which Railsback relied to her detriment in agreeing to the settlement.

[¶ 15.] **2. WHETHER THE TRIAL COURT ERRED IN ITS DETERMINATION THAT RAILSBACK'S SUIT WAS AN IMPERMISSIBLE DIRECT ACTION AGAINST AN INSURER.**

[¶ 16.] Because there is no privity between an injured person and the tortfeasor's insurer, the injured person generally has no right of action against the insurer. 44 Am.Jur.2d *Insurance* § 1445 (1982). However, "a claimant may become entitled to bring a direct action where the insurer has taken on a new and independent obligation to the victim as a result of the insurer's efforts to negotiate a settlement of the victim's claim." Lee R. Russ & Thomas F. Segalla, 7 Couch on Insurance 3d, § 104:6 (2003).

[¶ 17.] The insurer relies on our decision in *Trouten* to support the trial court's determination that Railsback's action is an impermissible direct action against an insurance company. Insurer argues that Railsback has no right to bring a claim against the insurer without first obtaining a judgment against the tortfeasor, Hauglin. This argument ignores the purpose of the direct action rule, which is to protect insurers from large personal injury jury awards based on the jury's discovery that the tortfeasor is insured. It is not to force an insured tortfeasor to defend claims against the insurer for the manner in which the insurer engages in settlement negotiations. Hauglin was liable to Railsback for his negligence, but he cannot and should not be held to stand for allegations of fraud, deceit and misrepresentation in settlement negotiations with which he had no connection. We implicitly acknowledged this in *Trouten* which provided:

> [A]bsent an express or clearly implied right to sue [an insurer] directly *for medical expenses,* [an injured person] cannot maintain an action *to recover medical expenses* directly from [insurer], at least until after settlement, adjudication, or release of claim.

*Trouten,* 2001 SD 106 at ¶ 23, 632 N.W.2d at 861 (quoting *Zegar v. Sears Roebuck Co.,* 211 Ill.App.3d 1025, 156 Ill.Dec. 454, 570 N.E.2d 1176, 1180 (1991)) (emphasis supplied). We have held,

> One who has executed a release or compromise of a cause of action sometimes feels that he was unduly pushed or fraudulently induced into making the agreement. In this situation there are several courses open to him. He may sue on the original cause of action and, when the release is tendered as a

defense, assert its invalidity. He may begin an equity action to set aside or reform the release or compromise agreement. Or he may affirm the agreement and bring an action of deceit to recover the damages he suffered by reason of executing the same. *Tucek,* 511 N.W.2d at 835. The trial court's holding does not allow these' remedies for those defrauded by insurance companies. This would remove all rules of fair dealing in settlement negotiations between third-party claimants and insurance companies. The inequity of the determination can be clearly seen by the following example. If the tortfeasor was uninsured, and he and the claimant entered into settlement negotiations, the tortfeasor would be required not to defraud, deceive or make misrepresentations to the claimant. Under the trial court's interpretation of "direct action," the insurer, which stands in the shoes of the insured, has no such duty and cannot be held directly accountable. The policy implications of such a determination were well explained by the United States District Court for the District of Delaware:

> First, insurance companies would have everything to gain and nothing to lose by systematically defrauding tort claimants into accepting low settlement offers. In such cases the company gambles that the deceit will not be uncovered. If the fraud is uncovered, then the company only faces litigation, or the costs of reimbursement, that it would have had to confront without a settlement. In economic terms, some insurance carriers calculate an "opportunity cost" which is artificially low. If, in addition to the expense of a tort litigation, the cost of defending a fraud action were included in the calculation, the opportunity cost of committing the fraud would be a good deal higher. In the language of the law, the defendant should not be unjustly enriched. [ ]

> Moreover, such a rule would enforce a higher standard. of care among insurance agents, thus helping to prevent cases of merely negligent misrepresentation.

> Second, the opportunities for over-reaching and committing fraud in releases of tort claims may be greater than in typical cases of commercial contract fraud, where the parties are more often on an equal footing. Duress, coercion, and immediate need for liquid assets are ever present for the unfortunate tort claimant. In many cases, plaintiffs have spent much, if not all, of the settlement sum on necessities before discovering the fraud.

*DiSabatino v. United States Fidelity Guar. Co.,* 635 F.Supp. 350, 355–356 (D.Del.1986) ·(footnote and internal citations omitted).

■ [¶ 18.] Our "direct action" statute also does not support the trial court's determination. SDCL 58–23–1 provides:

> All liability insurance policies issued in this state shall provide in substance that if an execution upon any final judgment in an action brought by the injured or by another person claiming, by, through, or under the injured, is returned unsatisfied, then an action may be maintained by the injured,.or by such other person against the insurer under the terms of the policy for the amount of any judgment recovered in such action, not exceeding the amount of the policy, and every such policy shall .be construed to so provide, anything in such policy to the contrary notwithstanding.

The statute limits recovery by the injured claimant under the terms of the policy. The present action is not brought under the terms of the policy, but rather as an ancillary claim pertaining to the insurance company's negotiation and settlement

practices. The direct action prohibition does not apply in this circumstance. The trial court's determination that this suit was an improper direct action against an insurance company is reversed.

[¶ 19.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.