# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 06-2466/2467

_____

Eugene P. Kent,                                    *
                                                   *
    Appellee/Cross-Appellant,               *
                                                   *
v.                                                 *
                                                   * Appeals from the United States
United of Omaha Life Insurance                     * District Court for the
Company, a Nebraska corporation                    * District of South Dakota.
with its principal office at Mutual of             *
Omaha Plaza, Nebraska,                             *
                                                   *
    Appellant/Cross-Appellee.               *

_____

Submitted:  March 14, 2007
Filed:  May 3, 2007

_____

Before WOLLMAN, JOHN R. GIBSON, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Eugene P. Kent, an insurance agent who did business with United of Omaha Life Insurance Company (United), brought this action for breach of fiduciary duty and deceit, claiming damages for the loss of his insurance license and for loss of his liberty while imprisoned for mail fraud. A jury awarded him $27,400,000 in damages. United moved for judgment as a matter of law, and the district court granted the motion in respect to his loss of liberty claims and also reduced the punitive damages awarded for the loss of his license. Judgment was then entered in Kent's favor for

$4,800,000. United appeals from that judgment, and Kent cross appeals the dismissal of his loss of liberty claim and the reduction of his punitive damage award.

I.

Kent had sold life insurance for approximately 12 years and operated his own insurance business, Kent Insurance, Inc., for six years before he agreed in 1985 to serve as the exclusive agent for the Independent Community Bankers Association (ICB) in its search for a health insurance provider. Kent first contracted with Central Life Insurance Company (Central) to provide health insurance for ICB, but in August 1989 Central informed Kent that it would no longer offer group coverage and that he needed to find a new provider. Kent approached United later that year and it was agreed after negotiations that United would provide health insurance for ICB beginning in January 1990 and that it would designate Kent as the insurance agent for these transactions.[1] Kent received an 8% fee from United for the ICB account, and he rebated a portion of his fee to ICB.

In late 1990 Kent initiated talks with United about converting the fully insured ICB health insurance plan into one that would be self insured and using his financial services entity, Kent Financial, Inc., as the plan sponsor. Although some member banks had expressed an interest in a self insured policy, Kent did not tell ICB that he was discussing conversion of the health insurance plan with United nor did he inform United that he did not have authorization from ICB for the proposed conversion. He discussed the conversion with United's regional manager, Dick Norberg, who sought advice from its legal department about the self insured plan. Norberg then told Kent about requirements for converting the plan, such as the need for new descriptive materials and a joint checking account with Kent. They agreed that the plan sponsor

_____

[1]At that time South Dakota required that insurers have policies "written through a licensed resident agent." S.D.C.L. § 58-6-62 (1990). A United representative testified at trial that Kent "was kind of a dual agent" representing both it and ICB.

-2-

would be required to maintain a sufficient reserve while United would provide stoploss coverage for excessive losses and services pursuant to an "administrative services only" agreement. Norberg also informed Kent that United's legal department considered it likely that his practice of rebating a portion of his fee to ICB was illegal.

Although Kent never told ICB that he had switched the plan into one that was self insured and still had not informed United that ICB had not authorized the conversion, United and Kent began treating the ICB plan as being self insured beginning in January 1991. United sent Kent a contract for the administrative services provision later that month, but Kent did not sign it because it listed ICB as the plan sponsor and not him. United also sent Kent a check made out to ICB for $150,000 based on unused premiums paid in 1990, and Kent deposited the check in the joint account he had opened with United. Kent withdrew $10,000 per month from the joint account as his fee and used the account to pay claims for the 1991 year.

The legal department at United continued examining the legality of the self insured plan after it had been implemented. Norberg sent Kent a letter on February 7, 1991 saying that the self insured plan put United at risk "financially and legally" and that Kent could also be at risk for operating an insurance company without a license. Norberg proposed that ICB instead operate on a "minimum premium plan" and advised Kent to talk to his own attorney. Kent met with his attorney and called Norberg in late February to request that the ICB plan be converted to a minimum premium plan.

United never converted the plan into a minimum premium plan and did not immediately inform Kent that it continued to treat the ICB plan as one that was self insured. It sent Kent a check in May that was again made out to ICB for repayment of unused premiums, and Kent deposited it in the joint account. After receiving additional documents in July and August listing ICB as the plan sponsor for a self insured plan, Kent requested a meeting with United. Kent told United for the first

-3-

time at that meeting that he had never been given the authority to convert the ICB plan into a self insured plan and that ICB did not know that it was operating under such a plan. United then reinstated the fully funded plan retroactive to January 1, 1991, and Kent forwarded funds to United in the amount of the two checks that had been made payable to it. United terminated the coverage at the end of 1991, and ICB terminated its relationship with Kent at the same time.

After ICB learned that its plan had been converted into a self funded plan, it filed lawsuits against both United and Kent seeking monetary damages. Kent responded by seeking indemnification from United. A settlement was reached in September 1995 under which United agreed to pay ICB $225,000 and Kent agreed to pay it $75,000. A settlement agreement was signed by all three parties which released "any and all claims which either have been or could have been raised by any party against the other . . . relating to" ICB's health insurance in 1990 and 1991.

The state insurance division also commenced proceedings. As a result, United agreed to a penalty of $42,500, and an administrative law judge recommended that Kent's insurance license be revoked. The insurance division revoked the license in August 1995, concluding that Kent had "deliberately concealed" from ICB that he was converting its fully insured plan into a self insured plan and that he had also withheld from United the fact that he was acting without authority from ICB. Kent appealed to the state circuit court which held that the revocation was justified, and the South Dakota Supreme Court affirmed. See Kent v. Lyon, 555 N.W.2d 106, 118 (S.D. 1996). Kent later reapplied for a new license, and the insurance division issued one in 2001, based in part on the fact that Kent had paid back to United the total amount of the premium checks he had deposited in his own account.

The United States Attorney also initiated a criminal investigation into Kent's relationship with ICB and United. A 61 count indictment issued in 1996 indicting Kent for mail fraud and money laundering. Kent was found guilty by a jury on two

-4-

of the mail fraud counts which charged that the mails had been used to deposit the ICB checks into the joint account. At trial Kent's former secretary and Norberg both testified that the mails had been used, but prior to sentencing Kent began to question whether the checks had actually been sent through a private courier. Kent sought to obtain the shipping records from United, but it would not release the documents without a subpoena. The district court declined Kent's request for a subpoena, and the government did not consent to one. Kent never sought a subpoena from the clerk of court but instead filed a motion for a new trial. Attached to the motion were his former secretary's affidavit stating that her testimony had been in error and evidence from his own records indicating that a private courier had been used to deliver one of the checks. The court denied Kent's motion for a new trial and sentenced him to 27 months imprisonment.

After completing his sentence Kent filed a habeas petition and served a subpoena on United for the shipping documents. United complied with the subpoena, providing evidence that both checks had been sent through United Parcel Service (UPS). His mail fraud convictions were subsequently vacated. Kent also sued the lawyer who had represented him in the criminal court for malpractice and settled his claim for $330,000.

Kent alleges in this case that United had a fiduciary relationship with him which it breached and that it violated the South Dakota statute on deceit. His complaint further alleged that United was liable for the revocation of his insurance license because it failed to inform him in 1989 of the legal problems associated with a self insured plan and because it delayed in informing him that it had not converted the self insured plan into a minimum premium plan. Kent also seeks to hold United responsible for his loss of liberty due to the mail fraud convictions. He points out that the convictions were vacated because the checks had in reality been sent by UPS rather than through the mails. When he tried to get proof of this before his sentencing, United refused to produce the evidence without a subpoena. Kent complains that

United had a fiduciary duty to turn over the shipping documents to him and that Norberg had deceitfully misled the jury into concluding that the checks had been mailed.

In support of his loss of license claim, Kent testified at trial that he would not have converted the ICB plan into one that was self insured had he been informed of risks of which United was aware. He also testified that United told him to deposit the checks made payable to ICB into their joint account and that he had assumed that a minimum premium plan was in place for ICB through the summer months of 1991. Kent said he had asked Norberg for advice as to whether he should proceed with the self insured plan, and Norberg told him it would be no problem even though he knew it involved a great amount of legal risk. Kent also told the jury that he had made it known during 1991 that he thought the plan was being converted to a minimum premium plan and that he continued to assume that the plan had been converted as late as August 1991 because United was slow with paper work. As for the loss of liberty claim, Kent testified about his difficulties while incarcerated and the effect his imprisonment had on his family. Kent also sought to establish that United had not given him the shipping documents for fear of reprisal from the government.

The district court allowed the loss of license and liberty claims to go to the jury. Over United's objection the court instructed the jury that "United owed a fiduciary duty to Kent" and that "a fiduciary's duty is to act in the utmost good faith." The instruction was not charge specific nor time specific. The jury returned a verdict in favor of Kent for $27,400,000 in damages. It awarded $17 million for his loss of liberty ($10 million in punitive damages) and $10.4 million for the loss of his insurance license ($7.5 million in punitive damages). United moved for judgment as a matter of law on all claims. The court granted its motion for the loss of liberty claim after concluding that any special relationship between Kent and United had ended before the criminal trial and that United had no duty to give Kent the shipping documents without a subpoena. The district court also reduced the punitive damage

award on the loss of license claim to $2.4 million, leaving Kent with a $4.8 million judgment. Both parties appealed.

United appeals the district court's denial of its motion for judgment as a matter of law on Kent's loss of license claim. It argues that Kent's claim based on breach of fiduciary duty and deceit could not prevail because Kent and United never had a fiduciary relationship and it was not responsible for the loss of his license. It also maintains that the loss of license claim is barred by collateral estoppel, the statute of limitations, the terms of the 1995 release, and public policy. Kent responds that his license would not have been revoked but for United's conduct and that the district court correctly determined that its affirmative defenses failed.

Kent cross appeals the judgment concerning his loss of liberty claim. He argues that there was sufficient evidence to support the jury verdict holding United responsible for his loss of liberty while he was imprisoned for mail fraud. He argues that United had a duty to provide him with the shipping documents due to Norberg's inaccurate testimony and its fiduciary relationship with him. United responds that no fiduciary relationship existed and certainly not at the time of the criminal proceedings. It also argues that the deceit claim fails as a matter of law because no United representative made a statement on which Kent relied to his detriment.

## II.

We turn first to United's appeal and its argument that the district court should have entered judgment in its favor on Kent's loss of license claim because it is barred by collateral estoppel since the South Dakota Supreme Court conclusively determined that Kent's own dishonest conduct justified revocation of his license. Kent responds that United can be held legally responsible in this proceeding because the question of whether its misconduct caused revocation of his license was not at issue in the state proceedings and because an adverse result can have more than one legal cause.

The parties also disagree about the appropriate standard of review for the issue of collateral estoppel. Kent argues that we should review the district court's decision not to apply collateral estoppel for an abuse of discretion, citing Berger Transfer & Storage v. Central States Pension Fund, 85 F.3d 1374, 1376-77 (8th Cir. 1996). In Berger Transfer, we indicated that district courts have discretion whether to apply "offensive nonmutual" collateral estoppel. Id. That doctrine applies when a plaintiff is attempting to prevent a defendant from pursuing an issue that the defendant previously litigated and lost to a different plaintiff. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n. 4 (1979). The scenario here is different, however, because defendant United is seeking to prevent plaintiff Kent from relitigating an issue. United is thus seeking to apply collateral estoppel defensively. Kent has cited no supporting authority for his argument that the district court's rejection of United's collateral estoppel defense should be reviewed under an abuse of discretion standard even though United was not a party to the earlier proceedings. See Blonder-Tongue Labs, Inc. v. Univ. of Ill. Found., 402 U.S. 313, 325 (1971). The appropriate standard for our review is de novo. Robinette v. Jones, 476 F.3d 585, 588-89 (8th Cir. 2007).

For Kent to prevail on either his fiduciary duty or deceit claim that United is responsible for the loss of his insurance license, he must prove that United caused him to lose his license. See, e.g., Chem-Age Indus., Inc. v. Glover, 652 N.W.2d 756, 772 (S.D. 2002) (causation is element of claim for breach of fiduciary duty); S.D.C.L. § 20-10-1 (same for statutory deceit claim). Kent cannot prevail on these claims if it was established in the state revocation proceedings that it was his own misconduct and dishonesty that caused the insurance division to revoke his insurance license rather than the conduct of United. See Shevling v. Butte County Bd. of Comm'rs, 596 N.W.2d 728, 731 (S.D. 1999) (collateral estoppel "prevents relitigation of issues previously litigated"). The principles of collateral estoppel are fully applicable where the basic set of facts was established during state administrative proceedings. See Gottschalk v. S.D. State Real Estate Comm'n, 264 N.W.2d 905, 907-09 (S.D. 1978).

Based on evidence presented to the insurance division, the South Dakota Supreme Court concluded that Kent had violated "seven provisions of the Insurance Code" and that the decision to revoke his license was not "too harsh a penalty" based on Kent's misrepresentations, fraudulent conduct, and general dishonesty. Kent v. Lyon, 555 N.W.2d 106, 117-18 (S.D. 1996).[2] The court found specifically that Kent made "material misrepresentations to United about his authority," that he "fraudulently concealed material facts from ICB," and that he "evinced a dishonesty in the manner in which he conducted his affairs." Id. at 117. The court also concluded that Kent "cannot now blame United" because it was his responsibility to inform ICB of the change in its policy, id. at 112, and that "United's conduct was far less egregious than his." Id. at 117.

Kent had full opportunity during the revocation proceedings to argue that his license should not be revoked because it was not his fault or was instead caused by United's conduct, and all four state decisions concluded that his own conduct constituted sufficient cause for revocation of his license. Application of collateral estoppel in such circumstances prevents "inconsistent judicial decisions" from being made "on the same set of facts," and Kent's argument that United was the cause of his license revocation is a collateral attack on the earlier judgment. Frigaard v. Seffens, 599 N.W.2d 646, 650 (S.D. 1990). The state supreme court concluded that Kent's misconduct supplied more than sufficient grounds for the revocation, Kent, 555 N.W.2d at 118, and he cannot blame United for the revocation nor relitigate that conclusion in this action. See Shevling, 596 N.W. 2d at 728.

Kent raises two additional arguments as to why collateral estoppel is inapplicable in this case, but neither merits extended discussion. He persuaded the

---

[2] Kent points out that the state court opinion was not introduced into evidence, but we may take judicial notice of other judicial opinions, and the earlier proceedings are relevant in deciding a claim of issue preclusion. See, e.g., Wedow v. City of Kansas City, MO, 442 F.3d 661 (8th Cir. 2006).

insurance division in 2001 to permit him to sell insurance again by producing new evidence, some of which he had only recently obtained from United, showing that he had not misappropriated the returned premium checks. The discovery of additional evidence does not afford Kent "a second opportunity to prove a fact or make an argument relating to an issue previously decided," however, see Liberty Mut. Ins. Co. v. FAG Bearings Corp., 335 F.3d 752, 762 (8th Cir. 2003), and the state court has already decided that Kent was responsible for his license being revoked.

Kent also asserts that United failed to preserve its collateral estoppel argument for review. We disagree. United first attempted to dismiss the loss of license claim based on collateral estoppel when it moved for summary judgment in October 2003. It raised this argument again in its trial brief submitted to the district court in August 2005. United then moved for judgment as a matter of law based on collateral estoppel three different times: at the close of Kent's evidence, at the close of all the evidence, and after the verdict. The court denied all three motions, noting in its post judgment order that "[United] reasserts each and every argument it has ever made in this case in support of its post-trial motions." Based on the record we conclude that United preserved the issue of collateral estoppel for our review and that the district court erred by not dismissing the loss of license claim on this basis. Because of this conclusion we need not address the other issues United raises in respect to this claim.

## III.

Kent cross appeals the district court's dismissal of his loss of liberty claim. He argues that the evidence was sufficient to support both his fiduciary duty and deceit theories because United had a duty based on the parties' relationship and Norberg's misleading testimony to provide him with the shipping documents. United responds that in the absence of a subpoena it had no legal obligation to provide Kent with the documents and that Norberg's testimony did not create such an obligation.

The district court instructed the jury that United and Kent were in a fiduciary relationship and that United owed Kent the duty to act in the "utmost of good faith." Although it originally permitted Kent's loss of liberty claim to go to the jury, it later granted United's motion for judgment as a matter of law. It concluded that any special relationship between Kent and United ended prior to commencement of the criminal trial and that United had no responsibility to give Kent the shipping documents and that United had not deceived Kent.

Whether parties are in a fiduciary relationship is a question of law, see Bienash v. Moller, 721 N.W.2d 431, 434 (S.D. 2006), which we review de novo. The court's decision to grant a motion for judgment as a matter of law is also a legal question reviewed de novo. See Gardner v. Buerger, 82 F.3d 248, 251 (8th Cir. 1996). We will affirm entry of judgment as a matter of law when "all the evidence points in one direction and is susceptible to no reasonable interpretation supporting the jury verdict." Hathaway v. Runyon, 132 F.3d 1214, 1220 (8th Cir. 1997) (citation omitted).

To recover for breach of fiduciary duty in South Dakota, a plaintiff must prove: (1) that there was a fiduciary relationship between the parties, (2) that the defendant breached a fiduciary duty to the plaintiff, (3) that the plaintiff incurred damages, and (4) that the breach was a cause of the plaintiff's damages. Chem-Age Indus., Inc., 652 N.W.2d at 772. A fiduciary relationship exists when one party places "peculiar confidence" and trust in another and the trusted party "undertakes to act primarily for another's benefit." High Plains Genetics Research, Inc. v. JK Mill-Iron Ranch, 535 N.W.2d 839, 842 (S.D. 1995) (citation omitted). Fiduciary duties are not present in "arm's-length business relationships," id., and the law only implies such duties where there exists "a certain inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions" giving one party an advantage over the other. Mash v. Cutler, 488 N.W.2d 642, 652 (S.D.1992).

Kent maintains that a fiduciary relationship existed between United and himself, pointing to the facts that United officially named him its agent and that he relied on its expertise in the area of health insurance plans. He relies on a statement in Shen v. Leo A. Daly Co., 222 F.3d 472 (8th Cir. 2000), that "a principal and agent are in a fiduciary relationship," id. at 477, for support of his position that his title as an agent created a fiduciary relationship. We held in Shen, however, that the "facts underlying the relationship" and not "the terminology the parties use to characterize their relationship" determine whether two parties are in a principal-agent relationship. Id.; see also Dodd Ins. Servs., Inc. v. Royal Ins. Co. of Am., 935 F.2d 1152, 1156-57 (10th Cir. 1991) (holding that insurance provider did not owe fiduciary duties to independent agency selling its policies).

When Kent approached United in 1989 he was acting in his capacity as the exclusive agent of ICB and seeking a health insurance provider for it. Kent was an experienced businessman who had been selling life insurance for many years. He suggested to United the idea of converting the ICB plan into one that was self insured, and United agreed to the conversion and provided Kent minimal guidance as to what was needed. It never represented to Kent that he could rely on its expertise or that it was acting primarily for his benefit. See Sporleder v. Van Liere, 569 N.W.2d 8, 20 (S.D. 1997). United in fact told Kent that he should seek independent legal advice before continuing operation of the self funded plan, and Kent retained separate counsel. See Taggart v. Ford Motor Credit Co., 462 N.W.2d 493, 500 (S.D. 1990) (finding no fiduciary relationship where plaintiffs hired independent counsel to protect their interests). Although United had more experience in health insurance, the evidence establishes an "arms length business relationship" between the parties. Because inequality of knowledge alone is insufficient to give rise to a fiduciary relationship, see Schwaiger v. Mitchell Radiology Assocs., P.C., 652 N.W.2d 372, 380 (S.D. 2002), we conclude that the district court did not err by dismissing Kent's claim that United breached fiduciary duties owed him.

Kent also claims that the district court erred by dismissing his claim that the refusal to give him the shipping documents constituted statutory deceit. For Kent to prevail on this claim, he must have produced evidence demonstrating that United "willfully deceived him" with the "intent to induce him to alter his position" and that such deceit caused him an injury. S.D.C.L. § 20-10-1. The South Dakota legislature has defined deceit to include:

> (1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true,
> (2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;
> (3) The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or
> (4) A promise made without any intention of performing.

S.D.C.L. § 20-10-2. Kent argues that the evidence was sufficient to show deceit under both prongs of subsection (3) of the statute. He argues that United should be held responsible for withholding the documents both because the relationship between the parties bound United to produce the shipping documents for Kent and because Norberg's inaccurate testimony was not only "likely to mislead" but actually misled the jury into believing that the checks had been sent through the mails.

Kent first argues that their relationship imposed a duty on United to produce the shipping documents. South Dakota courts have never applied the deceit statute to impose "a duty to disclose information on parties to an arm's-length business transaction, absent an employment or fiduciary relationship." Taggart, 462 N.W.2d at 499-450. Because Kent was neither an employee of United nor did he have a fiduciary relationship with it, this argument fails as a matter of law. Furthermore, United's statement that it would not produce the documents without a subpoena was not untrue.

Kent's remaining argument is that the testimony of United's representative at the criminal trial misled the jury into believing that the postal service had delivered the checks and that United then had a duty to give him the documents which could show the testimony was inaccurate. The deceit statute provides a cause of action for plaintiffs who have been "willfully deceive[d]" by another and who have altered their positions based on the deceit. S.D.C.L. § 20-10-1. Kent does not argue that he was deceived by the inaccurate testimony but rather that the jury was misled. He has cited no case in which South Dakota courts have applied this statute in favor of a plaintiff when the misleading statements have been relied upon by a third party rather than the plaintiff. See, e.g., Railsback v. Mid-Century Ins. Co., 680 N.W.2d 652, 655 (S.D. 2004) (an "action for deceit requires proof that the misrepresentation was material . . . and that the other party relied on the misrepresentation") (citation omitted). We conclude that the district court did not err by dismissing this claim.

IV.

In sum, we affirm the district court's dismissal of Kent's loss of liberty claim, reverse and vacate the judgment in respect to his claim for loss of license, and remand to the district court for judgment to be entered accordingly.

_____